In the
United States Court of Appeals
For the Seventh Circuit

No. 00-2854

ROBERT J. TEZAK,

Petitioner-Appellant,

v.

UNITED STATES OF AMERICA,

Respondent-Appellee.

Appeal from the United States District Court
for the Northern District of Illinois, Eastern Division.
No. 96 C 7936--Wayne R. Andersen, Judge.

ARGUED March 1, 2001--DECIDED JULY 11, 2001


    Before HARLINGTON WOOD, JR., MANION, and
DIANE P. WOOD, Circuit Judges.

  HARLINGTON WOOD, JR., Circuit Judge.  On
October 25, 1993, Robert Tezak pled
guilty to charges of arson and
obstruction of justice in the District
Court for the Northern District of
Illinois. Tezak appeals the district
court's denial of his amended petition
for a writ of habeas corpus pursuant to
28 U.S.C. sec. 2255, which sought to have
his plea vacated on the ground that he
received ineffective assistance of
counsel in the entry of his plea
agreement and in submitting an appeal.
Tezak's motion to recuse the district
court judge for personal bias was also
denied. We have jurisdiction under 28
U.S.C. sec.sec. 1291 and 2253, and we
affirm.

BACKGROUND

  Tezak is a multi-millionaire/1 who was
a prominent member of the Republican
party in Will County/2 and has served
as a delegate to the Republican National
Convention. By age twenty-one, he was a
precinct chairman. In 1976, when he was
twenty-eight, he was elected to serve as
coroner of Will County and was re-elected
through 1988. Prior to his election as
coroner, he served as deputy coroner for
nine years.

On August 6, 1987, a fire occurred at the Galaxy Bowl, a bowling alley in Cresthill, Illinois. Although the building was not totally destroyed, Colonial Penn Insurance paid out $50,610.94 in clean-up costs. A grand jury investigation was begun. On December 4, 1987 in Joliet, Illinois, a three-story building known as the PIC building, which housed the offices of the Will County Private Industry Council and the Will County Center for Community Concern, was destroyed by fire. As a result of the fire, Colonial Penn Insurance paid $132,940.15 in tenants' insurance and Standard Mutual Insurance reported a loss of $320,800.71 on the building. Following the fire, a joint federal and local arson investigation began.

After a lengthy investigation, a federal grand jury indicted six individuals, one of whom was Tezak, with conspiracy and arson in both fires. In December 1992, Tezak was charged in district court on four counts: (1) conspiracy to destroy the Galaxy Bowl by fire and to defraud Colonial Penn Insurance, (2) damage to real and personal property of Galaxy Bowl by fire,/3 (3) conspiracy to destroy the PIC building by fire, and (4) destruction of the PIC building and its contents by fire. Tezak pleaded not guilty on all counts.

On September 3, 1993, while Tezak was released on bond, the government moved to have his release revoked on the ground that he had violated certain conditions of his release, primarily that Tezak was alleged to have obstructed justice by intimidating a witness under 18 U.S.C. sec. 1512. In a statement made to government agents, Nikki Leber, Tezak's ex-daughter-in-law, stated that Mark Tezak, Tezak's son, met with her in August 1993 to give her a message from his father, telling her not to testify for the government in the case against Tezak because if she did, his father "would have her brains blown out." Leber stated that she met Tezak when she was sixteen and that he began a sexual relationship with her while she was still a minor. She stated that she continued to have a sexual relationship with Tezak while she was married to his son. She also stated that Tezak provided both her and his son cocaine on a regular basis

and that he had continued to provide her with cocaine up to the present time. In addition, both Leber and Mark Tezak testified that Tezak continued to use drugs after he was indicted./4 The district court revoked Tezak's bond on September 3, and, after reviewing the evidence at a hearing to reinstate Tezak's bond on September 16, denied reinstatement. In a second motion-to-reinstate-bond hearing on September 29, 1993, the district court again denied reinstatement after the government presented evidence showing that Tezak had purchased twelve guns in July 1993 (while under indictment) and that he lied on the purchase forms indicating that he was not under any indictment or information and then signed a statement swearing his answers were "true and correct."

On October 22, 1993, a superseding information was issued which included the previous four counts but added a fifth count of obstruction of justice for threatening a potential witness. Tezak signed a plea agreement that same day. On October 25, 1993, in court, Tezak pled guilty to counts one, two, and five pursuant to the plea agreement and admitted complicity in the PIC fire, although the government had agreed to dismiss counts three and four.

After three separate and lengthy sentencing hearings, judgment was entered on August 10, 1994, sentencing Tezak to five years probation on count one, nine years imprisonment on count two, and forty-six months imprisonment on count five, all sentences to run consecutively. He was also ordered to pay $659,106 in fines and $538,697.30 in restitution. A motion to extend the time for filing a notice of appeal was entered but was denied due to untimeliness. Tezak then filed a motion pursuant to Fed.R.Crim.P. 35 to reduce his sentence, which was also denied.

Before the district court had made a determination on the Rule 35 motion, Tezak was indicted by the State's Attorney of Will County on five counts of arson relating to the PIC fire. Tezak's attempt to dismiss the state indictment on double jeopardy grounds was denied by the state court, which holding was then upheld by the state appellate court. After a jury trial, Tezak was convicted

on all five counts of arson based solely on the transcript of his plea agreement, which contained the admissions about the PIC fire. Tezak was sentenced to three years state incarceration consecutive to his federal sentence. Tezak appealed the state conviction and sentence on several grounds, one of which was that the conviction violated the double jeopardy clause of the Constitution and 720 Ill. Comp. Stat. 5/3-4. The state appellate court affirmed the conviction and sentence.

Tezak then filed a sec. 2255 petition on December 3, 1996. Five months after filing the petition, Tezak moved to recuse Judge Andersen, the district court judge, on the alleged ground of personal bias. The district court denied the recusal motion. In his amended petition, Tezak claims that (1) his Sixth Amendment right to effective assistance of counsel was violated because attorney Steven Popuch allowed him to plead guilty and admit facts exposing him to state prosecution, thereby depriving him of the constitutional protection of the double jeopardy clause, (2) his Sixth Amendment right to effective assistance of counsel was violated because attorney Popuch failed to perfect an appeal even though Tezak indicated he wished to appeal, and (3) the district court committed error in denying Tezak's motion for recusal. The district court, after allowing discovery and holding an evidentiary hearing, denied Tezak's petition.

The first page of Tezak's plea agreement states that "this Agreement is limited to the United States Attorney's Office for the Northern District of Illinois and cannot bind any other federal, state or local prosecuting, administrative or regulatory authorities except as expressly set forth in this Agreement." There was no specific exemption on additional prosecution in the agreement. In addition, at Tezak's plea colloquy, the judge specifically asked Tezak if he understood that the plea agreement was limited to the U.S. Attorney's Office for the Northern District of Illinois and did not bind other federal, state, or local prosecuting, administrative, or regulatory agencies and authorities. Tezak said he understood.

In the plea agreement, Tezak stated, "I knew that the bowling alley was a financial failure, and that my partnership in the operation of the bowling alley was unprofitable. . . . I decided to burn down the bowling alley because I believed that I could collect approximately one million dollars on the fire insurance policy on the property." Tezak admitted that he asked one of his co-conspirators to arrange the arson and another to give the keys to the building to the arsonist and to have the building set on fire. Tezak also admitted complicity in the PIC building fire, stating that he was the actual owner of the building, although he had arranged for a friend to act as the owner of record in order to rent the building to the PIC, yet retain the appearance of nonpartisan involvement. Tezak stated that he was approached by John Bays, another prominent member of the Republican party in Joliet and a good friend of Tezak. Bays was the focus of a grand jury investigation and asked Tezak to destroy subpoenaed records which were housed in the PIC building./5 Tezak arranged for the building to be burned down. The building and all of the records were destroyed.

Tezak also admitted that while on pretrial release in August 1993 he told his son that he knew his ex-daughter-in-law Leber was cooperating with the government. Tezak directed his son to tell Leber that he would have "her brains [ ] blown out . . . and . . . cause her family to be killed." Tezak's son admitted that he conveyed that same message to Leber. In his pre-sentencing submission statement to the probation office, Tezak maintained that he "had no intention of actually harming Nikki or her family. Again, I have never harmed anyone in my life." The last statement, "I have never harmed anyone in my life," was a constant refrain made by Tezak.

The plea agreement stated that "the government shall be free to recommend whatever sentence it deems appropriate, including but not limited to recommending that defendant be sentenced to consecutive maximum periods of incarceration on each count totaling 20 years imprisonment, [and] that the court depart upward from the guideline range in imposing sentence on Count Five . . . ."

The agreement also stated that the district court would consider "the nature, scope and extent of defendant's conduct regarding the charges against him, and related matters, including all matters in aggravation and mitigation relevant to the issue of sentencing," indicating that the PIC fire could be used as an aggravating factor in order to impose a longer sentence.

Tezak initially retained Daniel Webb, George Lombardi, and Susan Mahoney from Winston & Strawn in Chicago to represent him in the criminal proceedings. However, in addition to the Winston & Strawn attorneys, in October 1993, Tezak hired Steven Popuch to assist with the plea agreement./6 In fact, Popuch was the only attorney to sign the plea agreement. At approximately the same time, Tezak also retained the legal services of Marcia Shein, an attorney from Atlanta, Georgia, who is a special consultant on sentencing issues. Tezak continued to be represented by all three groups of attorneys on various issues from the plea agreement to post-sentencing proceedings.

According to Popuch's testimony, Tezak was dissatisfied with the plea discussions and hoped that Popuch would be able to negotiate a more favorable plea agreement with the government, or, in the alternative, to represent Tezak at trial. Tezak believed Popuch's history with the prosecutor, given that Popuch and the prosecutor knew each other and were social acquaintances, would be helpful. Popuch noted that "what Tezak wanted to do was have no consequences at all. He realized that was no longer possible. Now, he wanted the best consequences that he could get." Popuch stated that although the government had agreed to dismiss the two counts relating to the PIC building, Tezak's testimony in the plea agreement relating to that fire would be considered under the sentencing guidelines as relevant conduct. Popuch stated Tezak agreed to discuss the two counts upon the condition of dismissal because the PIC fire occurred after the United States Sentencing Guidelines ("U.S.S.G." or the "guidelines") went into effect, thereby eliminating charges which would have allowed less flexibility in sentencing and which would have required more time served before being eligible for parole. The Galaxy Bowl fire

occurred prior to the guidelines going into effect and therefore allowed for a wider range of sentencing options by the judge and required less time served prior to parole eligibility. Popuch testified that he "remember[s] going over just about every [sentencing] option time and time and time again" with Tezak. In an October 15, 1993 memorandum to Winston & Strawn's client file, Webb notes that Tezak "wants Popuch to get a guarantee from Polales that if Tezak talks about the PIC fire, he will get the Galaxy Bowl/ Obstruction of Justice deal. . . . Tezak wants to be assured that no matter what he says about PIC, he will get the Galaxy Bowl/Obstruction of Justice deal."

Popuch also stated that he could not specifically remember if he ever discussed the consequences of pleading guilty to the PIC arson because he believed that no further action was going to be taken, although he did state that it would have been reasonable for him to have discussed it with Tezak. However, Popuch testified that he definitely remembers discussing with Tezak the possibility of a separate non-federal prosecution at both the state or local level based on Tezak's admissions in the plea agreement. He distinctly remembers telling Tezak that "local prosecutors still had the option of bringing a case against him," and that Tezak could be prosecuted for both the Galaxy Bowl fire and the PIC fire. In a memorandum written by Lombardi dated October 22, 1993 from the Winston & Strawn client file, Lombardi noted that he had "reviewed the plea agreement with Popuch and have told him that we think he did a good job. I asked him a number of times if he explained to [Tezak] the consequences of the various provisions and he said that he had. Polales would not agree to limit in any way [Tezak]'s possible future exposure for the crimes that he discloses while cooperating with the government . . . ." Popuch told Tezak that there can be parallel state and federal prosecutions and that he "routinely tell[s] federal clients and state clients who have possible federal charges that one does not necessarily exclude the other, that double jeopardy does not pertain." Popuch stated that he discussed the potential for Tezak being prosecuted by state authorities in connection with the Galaxy Bowl arson as well as the PIC arson,

although Popuch also told Tezak that he believed "it was highly unlikely." Popuch also testified that as a criminal attorney who had at least twenty-two years experience, he made a tactical decision not to negotiate a resolution of potential state charges because "actual dual prosecutions are so rare, that you do not want to remind somebody that it is a possibility and awaken a sleeping tiger," particularly "knowing that they can prosecute a high-profile defendant." At the sec. 2255 hearing, Gary Shapiro, First Assistant U.S. Attorney, whose responsibilities included reviewing more than 500 plea agreements each year for approximately seven years, testified that out of all the pleas he had reviewed, in only one instance of multiple murders did the state ever pursue prosecution from a defendant's admission to uncharged, relevant conduct. He also stated that he considered state prosecution of plea admissions to federal uncharged conduct to be "a highly unusual event."

As to the appeal, Popuch stated that he discussed filing a notice of appeal with Tezak.

Immediately after the sentencing, [Tezak] was sitting in one of the jurors' seats. I was standing there talking to him. He was in shackles at the time. Marcia Shein was there and, I believe, George Lombardi. . . . And it was the unanimous feeling of all three of the attorneys that were present that no appeal would be viable and that he would do much better to do as the Judge had suggested even prior to sentencing, which [wa]s to pay the restitution and file a Rule 35 [motion to reduce sentence]./7

Popuch stated that he discussed the appeal again with Tezak in the week following the judgment and Tezak again agreed not to file one./8 Popuch testified under oath at the sec. 2255 hearing that Tezak "absolutely [did] not" contact him to file an appeal in the two weeks after judgment was entered, nor did he have any communication with James Casey, Popuch's associate,/9 as to Tezak wanting to file an appeal.

In Shein's deposition testimony, she recalled a discussion with Tezak, Webb, and Popuch in the courtroom after sentencing on July 29, with all parties

agreeing that Tezak should pursue restitution and a Rule 35 reduction of sentence motion, stating that "[an] appeal would not be viable" and "would be frivolous." She stated that Tezak agreed with them about not filing an appeal. She explained that she also thought an appeal would be useless because of the U.S.S.G. sec. 2J1.7/10 issue concerning the obstruction of justice charge committed while on release, because the judge had stated he would have departed upward with or without consideration of that issue.

   Shein also stated that Judge Andersen had repeatedly emphasized how serious Tezak's offenses were and how important restitution would be. She noted, however, that while "[Tezak] wanted the Court to think he was going to pay [restitution] and get the benefit of that consideration," as far as she was aware, Tezak has never paid any restitution. In addition, she stated that at the sentencing hearing on July 29, "Judge Andersen was upset about the bankruptcy issue and how [Tezak] was attempting, [Judge Andersen] felt . . . to manipulate the Court on this information . . . ." Shein was referring to information given by Robert Cook, Tezak's bankruptcy attorney from Arizona, who addressed the court at the May 16, 1994 sentencing hearing. Cook, who had specialized in bankruptcy for over twenty-four years, told Judge Andersen,

Three hundred thousand dollars has been paid toward restitution. . . . Mr. Tezak in no uncertain terms instructed me to pay restitution period, [although] in order for Mr. Tezak to have made the restitution which he did, it was necessary to file Chapter 11 because one of his large secured creditors was out and tried to impound and enforce judgements . . . . All of the claims would have undergone extreme difficulty in being, in my opinion, confirmed and approved of in a proof of claim trial in the Bankruptcy Court.

However, at the July 29, 1994 sentencing hearing, Cook testified the checks issued for restitution were actually conditional endorsements which basically rendered the checks "valueless." The judge stated, "My impression then [at the previous hearing] and my impression now is that those checks were physically issued to try to

make me believe that it was done, that restitution was paid. And it turned out that it hasn't been paid."/11

In responding to the production of a copy of a handwritten letter addressed to Popuch and signed by Tezak, dated August 4, 1994, which directs Popuch to file a notice of appeal, Popuch stated that he never received any such letter and that it was "clearly manufactured" after the fact. Popuch also noted that had Tezak instructed him to file a notice of appeal, even though it was against Popuch's advice, he would have been obligated to do so and that it was a simple matter to file the one-page notice.

However, contradicting Popuch's statements is the deposition testimony of Casey,/12 the associate who assisted in Tezak's defense. Casey testified that he was "basically a conduit between Mr. Tezak and Mr. Popuch," and that he met four or five nights every week with Tezak after the July 29, 1994 sentencing hearing. He stated, "On more than one occasion, Mr. Tezak made abundantly clear to me that he wanted his notice of appeal filed, notwithstanding the fact that there was a plea agreement in this particular case," and that Casey advised Popuch of this "not just once but on several occasions." Casey also stated that one day after the ten-day deadline for filing the notice of appeal expired, he recalled Popuch realizing that he had "dropped the ball."

There was also a memorandum dated September 9, 1994 from the Winston & Strawn client file written by Mahoney, which stated that Casey told her he planned to file a notice of appeal. She stated that Casey had told Tezak there was no appealable issue and that Casey believed Tezak agreed with him, but wanted to file the notice anyway.

ANALYSIS

A.  Standard of Review

We review the denial of a sec. 2255 petition for clear error on factual matters and de novo on questions of law. Mason v. United States, 211 F.3d 1065, 1068 (7th Cir. 2000).

B.  Ineffective Assistance of Counsel

In order to make a claim for ineffective assistance of counsel, defendant must establish that counsel's performance was deficient and that this "deficient performance" caused prejudice to the defendant. Strickland v. Washington, 466 U.S. 668, 687-88 (1984). This analysis applies to guilty plea challenges based upon ineffective assistance of counsel claims. Hill v. Lockhart, 474 U.S. 52, 57-58 (1985). The district court correctly concluded that Tezak did not establish either factor.

1.  Plea Agreement

Tezak claims ineffective assistance of counsel because his lawyer allowed him to plead guilty and admit facts exposing him to state prosecution, thus depriving him of the constitutional protection of the double jeopardy clause. "A voluntary and intelligent plea of guilty made by an accused person who has been advised by competent counsel, may not be collaterally attacked." Mabry v. Johnson, 467 U.S. 504, 508 (1984).

Moreover, in the context of a guilty plea, a defendant is not entitled to sec. 2255 relief unless he can show that, but for the deficient advice of counsel, he would have insisted on going to trial. Hill, 474 U.S. at 59; Gargano v. United States, 852 F.2d 886, 891 (7th Cir. 1988). Tezak had three attorneys working on the plea agreement with him prior to his hiring a fourth criminal defense specialist (not to mention a fifth attorney specializing in sentencing issues). By dropping the PIC charges, Tezak not only reduced his sentence by a possible fifteen years,/13 but he limited his exposure under the guidelines. The record makes it clear that the prosecutor would not drop the sentencing guideline charges unless Tezak agreed to a truthful admission of facts about the PIC arson. The October 15, 1993 Winston & Strawn memorandum indicates that Tezak wanted the plea agreement and was not considering any other alternative. He brought in Popuch specifically to close the plea agreement deal. There was no reasonable probability that Tezak would have insisted on going to trial.

The plea agreement clearly states that it was limited to the United States Attorney's Office for the Northern District of Illinois and that there was no exemption from additional prosecution at either federal, state, or local levels. At Tezak's plea colloquy, Judge Andersen specifically asked Tezak if he understood that the plea agreement was limited to the United States Attorney's Office for the Northern District of Illinois and that there was no exemption from additional prosecution at any other federal, state, or local levels. Tezak answered that he fully understood that provision. He also stated that he "voluntarily underst[oo]d and accepted each and every term of [the plea agreement]." The judge also questioned Tezak about his legal counsel.

Judge: [I]n this case obviously Mr. Tezak is represented by four eminent attorneys. And I know that you have discussed with your lawyers the wisdom of multiple representation so that you could understand everything that has taken place. Do you feel comfortable with your representation now?

Tezak: Yes, sir.

Judge: And it's your desire to have Mr. Webb and his colleagues as well as Mr. Popuch represent you, correct?

Tezak: Yes, sir.

Judge: And you feel you have good, competent legal advice and feel comfortable with the advice you have gotten.

Tezak: Yes, sir.

In addition, Popuch's testimony, corroborated by the Winston & Strawn memoranda of October 15 and 22 indicated that Popuch had discussed the possibility of additional prosecution with Tezak. The record shows that Tezak's plea agreement was made voluntarily and intelligently, with knowledge of possible further prosecution.

As to ineffective assistance of counsel, Tezak has not established that attorney Popuch's performance was objectively unreasonable nor that he would not have entered a guilty plea absent counsel's

alleged errors. The fact that Popuch's strategy of not contacting state prosecutors to seek an agreement on the PIC arson does not amount to unreasonable performance. See United States v. Arvanitis, 902 F.2d 489, 494 (7th Cir. 1990) ("An inaccurate prediction, standing alone, does not constitute ineffective assistance.") (internal quotations and citation omitted). In addition, Shapiro's testimony at the sec. 2255 hearing indicated that Popuch's prediction that the state does not usually prosecute admissions of uncharged conduct was a reasonable conclusion. See Lane v. Singletary, 44 F.3d 943, 944 (11th Cir. 1995) (holding that it is not ineffective assistance of counsel to fail to advise defendant of possible subsequent prosecution arising from a plea agreement when counsel had reason to believe no subsequent prosecution would ensue). Popuch's performance was not deficient as required under Strickland. Nor did Tezak establish prejudice due to the fact that he would have insisted on going to trial, as discussed above. See Hill, 474 U.S. at 59. Tezak does not suggest that he is not guilty; he simply maintains that he should have had the opportunity to strike a better bargain with the government. This is not sufficient to establish prejudice. See Gargano, 852 F.2d at 891. Therefore, he has failed to satisfy either prong of the Strickland test on this issue.

2. Double Jeopardy

Tezak was not charged with the PIC arson but his admissions of fact were used as relevant conduct in order to enhance his sentence. The double jeopardy clause provides: "[N]or shall any person be subject for the same offence to be twice put in jeopardy of life or limb." U.S. Const., Amdt. 5. In clarifying double jeopardy jurisprudence, the Supreme Court stated that "a mere overlap in proof between two prosecutions does not establish a double jeopardy violation," relying "on the basic, yet important, principle that the introduction of relevant evidence of particular misconduct in a case is not the same thing as prosecution for that conduct." United States v. Felix, 503 U.S. 378, 386-87 (1992).

The double jeopardy clause does not bar

dual prosecutions in state and federal courts, even where the offenses are identical. See Heath v. Alabama, 474 U.S. 82, 92 (1978); United States v. Jordan, 870 F.2d 1310, 1312 (7th Cir. 1989). In addition, the Court specifically held that consideration of uncharged relevant conduct in determining a defendant's sentence under the federal sentencing guidelines does not constitute punishment for that conduct and double jeopardy does not bar a subsequent prosecution for that conduct. Witte v. United States, 515 U.S. 389, 403-04 (1995). There can be no double jeopardy violation with the subsequent state court prosecution based on the admission of facts about the PIC arson which was offered as an aggravating factor.

Finally, no double jeopardy violation occurred in federal court because Tezak pled guilty and was sentenced before he was indicted, tried, convicted, and sentenced in state court. A sec. 2255 petition is not the proper procedure for attacking the state conviction and sentence, which Tezak asserts was the double jeopardy offense and conviction. Tezak attempted to dismiss the state charges on double jeopardy grounds and failed. He also appealed his state conviction on double jeopardy grounds pursuant to 720 Ill. Comp. Stat. 5/3-4, which states in pertinent part:

(c) A prosecution is barred if the defendant was formerly prosecuted in a District Court of the United States . . . if such prosecution:

(1) Resulted in either a conviction or an acquittal, and the subsequent prosecution is for the same conduct, unless each prosecution requires proof of a fact not required in the other prosecution . . . .

In an unpublished opinion, the Illinois Appellate Court rejected Tezak's argument that sec. 5/3-4 barred state prosecution, noting that Tezak's participation in the PIC arson was used in the federal prosecution for sentencing purposes only in the Galaxy Bowl arson, and that dismissal of the PIC charges did not meet the conviction or acquittal requirement for the purposes of sec. 5/3-4. See People v. Porter, 620 N.E.2d 381, 384 (Ill. 1993) (holding that the absence of

one of the four requirements under 720 ILCS 5/3-4(c)(1), (1) federal or sister state prosecution must be former prosecution, (2) former prosecution must have resulted in acquittal or conviction, (3) both prosecutions must be for same conduct, and (4) proof of every required fact of one of the prosecutions must be required in other prosecution, renders sec. 5/3-4(c)(1) inapplicable).

Tezak also seems to be arguing that Popuch should have discussed the fact that state prosecution would have been barred by sec. 5/3-4 if he had been convicted or acquitted of the PIC arson. This argument makes no sense because throughout the record, it is clear Tezak wanted the PIC charges dropped. All of Tezak's arguments on this issue are without merit. Jeopardy does not attach to charges dismissed as part of a plea agreement. See United States v. Garner, 32 F.3d 1305, 1311 n.6 (8th Cir. 1994) (listing cases). Nor does ignorance of a possible state prosecution implicate the double jeopardy clause, see United States v. McKinley, 23 F.3d 181, 185 (7th Cir. 1994), even though there was evidence in the record that Tezak was aware of the possibility of additional prosecution.

C. Notice of Appeal

Tezak claims that he instructed Popuch to file an appeal. In addition to his own affidavit, he offered the affidavits of Cook (his bankruptcy lawyer) and his personal attorney in Arizona (who was not involved in the federal criminal proceedings), in support of this assertion. The district court allowed discovery on this issue and the depositions of Popuch, Webb, Casey, and Shein were taken. The court then held an evidentiary hearing. At the request of the government, Popuch testified at the hearing. Tezak did not call any witnesses nor did he testify. As discussed previously, conflicting testimony was presented about the filing of an appeal. The district court did not credit Casey's deposition testimony, which the court stated indicated a bias against Popuch on Casey's part due to the check forgery. Also, given Tezak's vocal and commanding participation in his defense presentation, the court found it improbable that even though the record contained numerous correspondence from

Tezak to his attorneys and numerous memoranda concerning Tezak's directives and complaints to all of his attorneys, there had been no complaint noted from Tezak, vocal or written, that his attorneys had failed to file an appeal until the filing of the sec. 2255 petition nearly two-and-a-half years later. The court also noted that Tezak never, at any time in his appearances before and during the Rule 35 motion, made a complaint about the failure of his attorneys to file a notice of appeal. The court discounted the letter from Tezak dated August 4, 1994 to Popuch, a copy of which was produced by Tezak, but never found in Popuch's files, particularly in light of the fact that even after Tezak allegedly sent this letter to Popuch, he continued to retain and be represented by Popuch. As for the Mahoney memorandum of September 9, the court noted that this discussion preceded Casey's filing on September 15, 1994, a motion to extend the time for filing a notice of appeal out of time, which the court denied due to untimeliness and for failure to state reasons of excusable neglect. Judge Andersen stated that the reasonable conclusion was that Tezak had decided to forego the appeal in order to pursue the Rule 35 motion, which, in fact, ensued. The district court found that Tezak had failed to credibly show that he asked Popuch to appeal the sentence or that Popuch refused to do so.

We accord the district court's credibility findings exceptional deference, United States v. White, 270 F.3d 656, 661 (7th Cir. 2001), and those findings "can virtually never be clear error." Anderson v. City of Bessemer City, N.C., 470 U.S. 564, 575 (1985) (citations omitted). As is clear from the record, Judge Andersen considered all of the conflicting evidence at length and in detail, and was in a far superior position to assess credibility. See United States v. House, 110 F.3d 1281, 1285-86 (7th Cir. 1997).

Tezak is mistaken in his reliance on Castillo v. United States, 34 F.3d 443 (7th Cir. 1994). The defendant in Castillo filed a sec. 2255 petition claiming that he had not made an effective waiver of his right to be represented by a different lawyer from his codefendant. Id. at 443. Castillo's

motion was supported by his affidavit. Id. at 444. The judge in Castillo held an impromptu "evidentiary hearing" at a routine status call on the motion, and, classifying the testimony of Castillo's probation officer elicited at that "hearing" as an "oral affidavit," denied Castillo's motion. Id. This court overruled that holding, noting that the use of affidavits does not allow a judge "to resolve the dispute by picking one affidavit over another that contradicts it . . . ." Id. at 445 (citations omitted). In the instant case, the judge was familiar with all of the particulars of the case and all of the parties and witnesses involved. Unlike affidavits, depositions were submitted which allowed for direct and cross examination by both parties. Tezak could have deposed additional witnesses or called them to testify at the evidentiary hearing. Instead, he chose to rely on the submitted depositions and his three affidavits. The district court did not err in assessing the evidence and making a credibility determination. Tezak is now asking this court to reassess that determination, but that is not a basis for appellate review. See United States v. Burke, 125 F.3d 401, 404 (7th Cir. 1997). We cannot say the district court's determinations on this issue are clearly erroneous.

D.  Recusal

   Five months after filing his sec. 2255 petition, Tezak filed a motion to recuse Judge Andersen pursuant to 28 U.S.C. sec. 144./14 Tezak maintains that (1) the affidavits of Tezak and John Bays establish factual assertions that Judge Andersen had a personal bias and prejudice against Tezak and (2) that various statements and comments made by the judge during the criminal proceedings establish bias. The district court denied the motion.

   A district court judge's decision not to recuse himself is reviewed under an abuse of discretion standard. United States v. Franklin, 197 F.3d 266, 269 (7th Cir. 1999). As to the first assertion, Tezak claims he was the underlying target of an investigation conducted by the Illinois Secretary of State's office against Bays in 1985. Bays was the target of the investigation involving the subpoenaed

documents which were destroyed in the PIC arson. Tezak argued that Judge Andersen was a high-ranking official of the Illinois Secretary of State's office, and therefore,

[in Tezak's] attempt to assist his friend by intervening in the investigation of the Secretary of State's office, he made himself the real target of the subsequent investigation. As a result of Mr. Tezak's power and influence at the time . . . Judge Andersen, while an official in the Chicago office of the Secretary of State's office had to have been aware of [these circumstances] . . . and as a result, had a bias against Tezak before any information was acquired by the judge during the course of the judicial proceedings.

A motion to disqualify a judge pursuant to sec. 144 is allowed if a party files a timely/15 and sufficient affidavit that the judge has a personal bias or prejudice against a party./16 United States v. Balistrieri, 779 F.2d 1191, 1199 (7th Cir. 1985). The factual statements of the affidavit must support an assertion of actual bias. Id. We can credit only those facts which are "sufficiently definite and particular to convince a reasonable person that bias exists; simple conclusions, opinions, or rumors are insufficient." United States v. Boyd, 208 F.3d 638, 647 (7th Cir. 2000), cert. denied, ___ U.S. ___, 121 S.Ct. 1072 (2001). The factual averments must be stated with particularity and must be definite as to times, places, persons, and circumstances. Balistrieri, 779 F.2d at 1199. The court must assume the truth of the factual assertions even if it "knows them to be false." Id. Although we must treat the factual averments as true, we are not bound to accept the movant's conclusions as to the facts significance. Id. at 1200.

Under sec. 144, the statute limits a party to filing only one affidavit in a case. Id. at 1200 & n.6. Tezak's affidavit states that he believed statements he had made in the past about having influence with Judge Andersen were made known to the judge. He states that he was then told he could have the case transferred to another judge, but elected not to do so. However, Tezak's affidavit states he was later told by Bays that

Judge Andersen had worked at the Secretary of State's office, allegedly during the time of the investigation, and if he had known that when he was offered the possibility of transferring to another judge, he would have chosen to do so./17 There are no specifics as to times, places, persons, or circumstances which show a definite connection between Judge Andersen and the Bays/ Tezak investigation. In addition, Tezak is relying on events which took place more than eight years prior to Tezak's appearance before Judge Andersen in 1992. The affidavit contains nothing to show that the supposed bias, if any, persisted over the years to the degree that the judgment of Judge Andersen was still effected in 1993. See Balistrieri, 779 F.2d at 1200-01. Nor does the affidavit present any factual details establishing Judge Andersen's involvement in the investigations that eventually led to Tezak's arrest. Even if Judge Andersen had been aware of the investigations,

Law enforcement professionals typically take action against a wide variety of persons during their careers, motivated by nothing more than a desire to carry out the duties of their offices. Even a series of actions against a person according to a plan is not enough in itself to show bias or prejudice; such activity is perfectly compatible with personally disinterested professional motivation.

Id. at 1201. All of Tezak's assertions are merely unfounded conclusions. Because Tezak's affidavit has not presented any facts establishing a connection between Judge Andersen and the Secretary of State's Bays/Tezak investigations, sec. 144 is inapplicable. See Boyd, 208 F.3d at 647.

Tezak also states that certain comments made by the judge during the sentencing hearings indicated prejudice against Tezak, resulting in a lengthier sentence. Actual bias under sec. 144 must show some personal animus or malice on the part of the judge. See Balistrieri, 779 F.2d at 1201. The general presumption is that judges rise above any potential biasing influences. See Withrow v. Larkin, 421 U.S. 35, 47 (1975). Comments made by the judge "during the course of trial that are critical or disapproving of, or even

hostile to, counsel, the parties, or their cases, ordinarily do not support a bias or partiality challenge." United States v. Liteky, 510 U.S. 540, 550-51 (1994) ("The judge who presides at a trial may, upon completion of the evidence, be exceedingly ill disposed towards the defendant, who has been shown to be a thoroughly reprehensible person. But the judge is not thereby recusable for bias or prejudice"). A judge's expressions of "impatience, dissatisfaction, annoyance, and even anger, that are within the bounds of what imperfect men and women, even after having been confirmed as federal judges" are not sufficient to demonstrate bias or prejudice. Id. at 555-56. There was no showing of a personal motive or a discriminatory prejudice on the judge's part. See Balistrieri, 779 F.2d at 1201. The record offers no evidence of any personal revenge or malice Judge Andersen had against Tezak. See United States v. Ward, 211 F.3d 356, 364 (7th Cir. 2000). In fact, the details of the record show just the opposite; Judge Andersen was extraordinarily fair-minded in his treatment of Tezak throughout all of the proceedings. The comments made during the course of Tezak's criminal proceedings are not sufficient to demonstrate bias or prejudice. The proceedings were well-handled and we find no abuse of discretion.

CONCLUSION

For the above-stated reasons, we AFFIRM the district court's denial of the amended sec. 2255 petition and its denial of the motion to recuse.

FOOTNOTES

/1 Tezak submitted a Personal Financial Report dated June 30, 1993, listing $33,596,000 in assets and $16,005,000 in liabilities. In March 1994, Tezak filed a Chapter 11 bankruptcy proceeding, No. 94-02014-PHX-GBN, in the District of Arizona, listing $29,193,857.50 in total assets and $17,230,623.46 in total liabilities. However, Tezak's attorneys argued throughout the proceedings that, in reality, Tezak's liabilities outweighed his assets.

/2 Tezak maintains a residence in Joliet, Illinois but sometime after 1982 purchased a $2.6 million second residence in Phoenix, Arizona, where he resided prior to incarceration.

/3 Counts one and two were not subject to the United States Sentencing Guidelines ("U.S.S.G." or the "guidelines") as the offense conduct occurred prior to November 1, 1987, after which date the guidelines went into effect.

/4 The district court ordered a urinalysis for drug testing to be done immediately after the September 3 motion hearing, but Tezak refused to provide a sample until two days later. He argued that he was in shock at the September 3 hearing and did not remember the judge ordering the test and that he may have remembered the judge ordering the test but that the judge did not order him to submit to the test. The results from that test had not been returned for the September 16 hearing on Tezak's second motion to reinstate bond. However, the results were received prior to the September 29 hearing, testing positive for cocaine and THC (a marijuana-hashish derivative).

/5 Tezak also admitted to a secondary interest in making a claim for loss of the building with the insurance company.

/6 A memorandum written by Webb dated October 15, 1993 taken from the Winston & Strawn file on Tezak stated that Webb had met with Tezak that day and Tezak "was adamant that we should not withdraw from the case.  . . . he stated that he was pleased with our representation of him and that he would not trust anyone else to try the case. . . . Tezak stated that he had hired Steve Popuch . . . [and] the scope of Popuch's representation was to be limited to negotiating a plea with [the government prosecutor] Dean Polales. He was not to handle anything in court. . . . Tezak also told me, off the record, that Popuch and Polales have a close personal relationship and that he believes this will help in getting a deal done."

/7 Popuch advised Tezak to pay the restitution first because Judge Andersen had "focused on [restitution] so much as a redemptive act and a rehabilitative act [which] he would take notice of both before and after sentencing." Shein also agreed on that position. However, Popuch also stated that Tezak had filed for bankruptcy prior to sentencing in the hope that the bankruptcy would impact on the amount of restitution to be assigned.

/8 The attorneys were in agreement to press the Rule 35 motion as the most expeditious means of reducing Tezak's sentence because, under the "old" Rule 35 at that time, if a defendant filed a notice of appeal, the district court was divested of jurisdiction and the Rule 35 motion could not

be filed until after the appellatemandate had issued. This would have caused considerable delay in addressing the sentencing issues given the fact that the attorneys believed there were no viable issues on appeal.

/9 Casey assisted Popuch on the Tezak case from the beginning. According to Popuch, in June of 1995, Casey inexplicably stopped coming to work. Although Popuch stated that other people had seen Casey and that he seemed physically well, Popuch never heard from Casey again. However, Popuch also testified that Casey had forged his signature and the signature of another partner on at least two checks drawn on the law office account. Popuch never located Casey but contacted Casey's father, who partially repaid the disputed funds.

/10 Section 2J1.7, Commission of Offense while on Release, provides, "If an enhancement under 18 U.S.C. sec. 3147 [penalty for an offense committed while on release] applies, add 3 levels to the offense level for the offense committed while on release as if this section were a specific offense characteristic contained in the offense guideline for the offense committed while on release."

/11 There is no evidence in the record to indicate that any restitution money was ever paid.

/12 Casey testified at his deposition that he now lives in Arizona, although he refused to state who his employer was. He also stated that he has had further contact with Tezak since moving to Arizona.

/13 Count three carried a maximum penalty of five years and count four a maximum of ten years.

/14 28 U.S.C. sec. 144 provides in pertinent part:

Whenever a party to any proceeding in a district court makes and files a timely and sufficient affidavit that the judge before whom the matter is pending has a personal bias or prejudice either against him or in favor of any adverse party, such judge shall proceed no further therein, but another judge shall be assigned to hear such proceeding.

The affidavit shall state the facts and the reasons for the belief that bias or prejudice exists, and shall be filed not less than ten days before the beginning of the term at which the proceeding is to be heard, or good cause shown for failure to file it within such time. A party may file only one such affidavit in any case. It shall be accompanied by a certificate of counsel of record stating that it is made in good faith.

/15 The motion must be filed "at the earliest moment after [the movant acquires] knowledge of the facts demonstrating the basis for disqualification." United States v. Sykes, 7 F.3d 1331, 1339 (7th Cir. 1993) ("two months after the allegedly prejudicial statement is certainly not 'at the earliest possible moment'"). Tezak's motion did not state when he knew of the alleged prejudice. Bays' affidavit stated that he told Tezak of Judge Andersen's connection with the Secretary of State's office after Tezak's federal sentencing. While it stretches credulity to think that Tezak was not made aware of this information during the two-and-a-half years from when the sentencing order was issued on August 10, 1994 to the submission of the recusal motion on April 29, 1997, it remains Tezak's burden to establish that the motion was filed at the earliest possible moment after learning of the facts showing bias. See id. Because Tezak has failed to state with particularity when he learned of the pertinent facts prior to filing the motion, we cannot say he has met this burden. However, we need not rely on this basis for dismissal due to our findings on the merits.

/16 Unlike sec. 144, which requires recusal of a judge when there is actual personal bias or prejudice, 28 U.S.C. sec. 455(a) requires a judge to recuse himself when his presiding over a case would create an appearance of bias. United States v. Troxell, 887 F.2d 830, 833 (7th Cir. 1989). Denial of a motion for recusal based on the appearance of impropriety can only be challenged with a writ of mandamus. A party cannot appeal a judge's failure to recuse under sec. 455(a) after the proceeding in question is completed. Id. Tezak correctly did not seek recusal under sec. 455(a).

/17 Bays' affidavit simply states that Bays was told by an official at the Illinois Secretary of State's office that "the person whom the investigation was really directed at was Robert Tezak for whom there was a personal dislike by several officials of the Secretary of State's office." There is no mention of Judge Andersen in Bays' statement. Even had both affidavits been considered, there are still no specific facts clearly indicating actual bias on Judge Andersen's part. See Balistrieri, 770 F.2d at 1200.