**NOT RECOMMENDED FOR FULL-TEXT-PUBLICATION**
File Name: 07a0245n.06
Filed: April 3, 2007

**No. 05-1948**
**No. 05-2642**
**No. 06-1122**
**No. 06-1652**

UNITED STATES COURT OF APPEALS
FOR THE SIXTH CIRCUIT

| | | |
|---|---|---|
| MARY SCOTT, | ) | |
| | ) | |
| Plaintiff-Appellant, | ) | |
| | ) | |
| v. | ) | ON APPEAL FROM THE |
| | ) | UNITED STATES DISTRICT |
| METROPOLITAN HEALTH CORPORATION, | ) | COURT FOR THE WESTERN |
| d/b/a METROPOLITAN HOSPITAL, a Michigan | ) | DISTRICT OF MICHIGAN |
| corporation, and MICHAEL FAAS, an individual, | ) | |
| jointly and severally, | ) | |
| | ) | |
| Defendants-Appellees. | ) | |
| | ) | |

_____

BEFORE: GUY, SUHRHEINRICH, and GRIFFIN, Circuit Judges.

GRIFFIN, Circuit Judge.

Plaintiff Mary Scott timely appeals five orders of the district court: the grant of summary judgment; the imposition of sanctions; the calculation of the amount of sanctions; the district judge's refusal to recuse himself; and the refusal to reconsider the recusal ruling. For the reasons that follow, we affirm the orders of the district court.

I.

–1–

The district court had jurisdiction over Scott's discharge claim pursuant to the general federal question statute, 28 U.S.C. § 1331, and venue was proper in the Western District of Michigan under the FCA, 31 U.S.C. § 3732(a). We have jurisdiction pursuant to 28 U.S.C. § 1291.

II.

We review the entry of summary judgment de novo. *Brainard v. Am. Skandia Life Assur. Corp.*, 432 F.3d 655, 660 (6th Cir. 2005). Summary judgment is proper where no genuine issue of material fact exists and the moving party is entitled to judgment as a matter of law. *Moross Ltd. P'ship v. Fleckenstein Capital, Inc.*, 466 F.3d 508, 515 (6th Cir. 2006) (citing FED. R. CIV. P. 56(c)). We construe the evidence in the light most favorable to the non-movant and draw all reasonable inferences in her favor. *Id.* The central issue is whether the evidence presents sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law. *Id.* "The mere existence of a scintilla of evidence in support of [non-movant]'s position will be insufficient; there must be evidence on which the jury could reasonably find for the plaintiff." *Id.*

In imposing sanctions against Scott, the district court invoked Rules 26(g) and 56(g) and the court's inherent authority. We review both a decision to impose sanctions and the determination of the amount of sanctions for abuse of discretion. *Jordan v. City of Cleveland*, 464 F.3d 584, 600 (6th Cir. 2006); *First Bank of Marietta v. Hartford Underwriters Ins. Co.*, 307 F.3d 501 (6th Cir. 2002). We will find an abuse of discretion only if the district court "based its ruling on an erroneous view of the law or on a clearly erroneous assessment of the evidence." *Cooter & Gell v. Hartmarx Corp.*, 496 U.S. 384, 405 (1990); *Salkil v. Mt. Sterling Twp. Police Dep't*, 458 F.3d 520, 527-28 (6th Cir.

2006). We will find an abuse of discretion only when we are left with "the definite and firm conviction that the court below committed a clear error of judgment . . . ." *Sako v. Gonzales*, 434 F.3d 857, 863 (6th Cir. 2006).

Finally, we review the judge's refusal to recuse himself for abuse of discretion. *United States v. Jamieson*, 427 F.3d 394, 405 (6th Cir. 2005), *cert. denied*, – U.S. –, 126 S. Ct. 2909 (2006). We likewise apply abuse-of-discretion review to the district court's denial of Scott's motion to reconsider the recusal decision. *United States v. Brown*, 449 F.3d 741, 750 (6th Cir. 2006).

III.

Scott asserts a claim under 31 U.S.C. § 3730(h), which provides, in pertinent part,

> Any employee who is discharged . . . or in any other manner discriminated against in the terms and conditions of employment by his or her employer because of lawful acts done by the employee on behalf of the employee or others in furtherance of an action under this section, including investigation for, initiation of, testimony for, or assistance in an action filed or to be filed under this section, shall be entitled to all relief necessary to make the employee whole.

The familiar *McDonnell-Douglas* burden-shifting framework applies to retaliation claims. To establish a prima facie case of retaliation, Scott had to show that (1) she engaged in protected activity, (2) defendant Metropolitan Health Corporation ("Metro") knew of this exercise of her protected rights, (3) Metro took an employment action adverse to her, and (4) there was a causal connection between the protected activity and the adverse action. *Balmer v. HCA, Inc.*, 423 F.3d 606, 613-14 (6th Cir. 2005).

If Scott establishes a prima facie case of retaliation, a presumption of retaliation arises; Metro may rebut that presumption by asserting a legitimate, non-retaliatory reason for the adverse actions.

*Balmer*, 423 F.3d at 614. The burden then shifts back to Scott to show by a preponderance of the evidence that Metro's stated lawful reason was a pretext for retaliation. *Id.* Scott must then produce sufficient evidence from which a jury could reasonably reject Metro's explanation and infer that Metro intentionally discriminated against her because of protected activity. *Id.*

To show pretext, Scott "must submit evidence demonstrating that the employer did not 'honestly believe' in the proffered non-discriminatory reason for its adverse employment action." *Id.* To inquire into the defendant's honest belief, the court looks to whether the employer can establish "reasonable reliance" on the particularized facts that were before the employer when the decision was made. *Id.* The key inquiry is whether the employer made a reasonably informed and considered decision before taking adverse action. *Id.*

As this court recently stated:

> If there is no reasonable dispute that the employer made a "reasonably informed and considered decision" that demonstrates an "honest belief" in the proffered reason for the adverse employment action, the case should be dismissed since no reasonable juror could find that the employer's adverse employment action was pretextual.

*Id.* Likewise, the Supreme Court has held that there are cases where a defendant is entitled to summary judgment, despite the plaintiff's success in making out a prima facie case:

> [A] plaintiff's prima facie case, combined with sufficient evidence to find that the employer's asserted justification is false, may permit the trier of fact to conclude that the employer unlawfully discriminated.
>
> This is not to say that such a showing by the plaintiff will *always* be adequate to sustain a jury's finding of liability. *Certainly there will be instances where, although the plaintiff has established a prima facie case and set forth sufficient evidence to reject the defendant's explanation, no rational factfinder could conclude that the action was discriminatory. For instance, an employer would be entitled to judgment as a matter of law if the record conclusively revealed some other, nondiscriminatory*

–4–

>    *reason for the employer's decision*, or if the plaintiff created only a weak issue of fact
>    as to whether the employer's reason was untrue and there was abundant and
>    uncontroverted independent evidence that no discrimination had occurred.

*Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 148 (2000) (emphasis added).

In determining whether Scott made out a prima facie case, the district court considered whether Metro's Board had sufficient notice of Scott's protected activity when it terminated her in January 2003. First, the district court had to decide what is required, as a matter of law, to place an employer on sufficient notice of FCA protected activity in such a situation. The court held that Scott had to give heightened notice to Metro because her responsibilities included legal compliance. The court then considered each instance of alleged protected activity proffered by Scott and found that none was sufficient to give Metro the requisite notice. The court refused to consider Scott's claim that she met with Faas in secret to express concerns about possibly illegal vascular-study compensation, because that claim contradicted her deposition testimony. The court determined that Scott did not give adequate notice of her possible intent to bring an FCA *qui tam* action until April 2002, when Scott reacted to notice of her reassignment by going to the Executive Committee with compliance issues. The court reasoned, "on Scott's own theory, Faas had already determined to terminate her before April 2002," so Faas's initial decision to terminate could not have been motivated by a desire to retaliate for FCA protected activity. *See United States v. Metro. Health Corp.*, 375 F. Supp. 2d 626, 646 (W.D. Mich. 2005).

The district court concluded its analysis of Scott's prima facie case by noting the implications of the undisputed fact that Faas was replaced as her superior and decisionmaker as soon as she raised compliance issues on April 17, 2002. The district court reasoned:

Furthermore, there is an even more basic causal problem for Scott's theory of liability. The causal chain between the "protected activity" and discharge was broken asunder when she brought her protected activity to the attention of [Metro's outside employment-law counsel Jeff] Fraser in April 2002. This act saved her from termination by Faas [because it caused the Board to rescind her just-announced reassignment to the dead-end, temporary Borgess project] and essentially[1] gave her new supervisors – the Board and Fraser.

*United States v. Metro. Health Corp.*, 375 F. Supp. 2d 626, 646 (W.D. Mich. 2005).

The court concluded by stating that, even if Scott could make out a prima facie case, defendants are entitled to summary judgment. Even putting aside all other complaints about Scott's conduct, Metro indisputably knew, before it terminated her, that she surreptitiously altered board minutes and presented them as the true minutes. The court also determined that Scott had not shown a genuine issue as to whether the board terminated her because it honestly believed the complaints:

Plaintiff has admitted facts which establish beyond any genuine issue of material fact that she wrongly altered corporate records . . . .[2]

* * *

Finally . . . Plaintiff also fails to make a showing to establish that the [stated] reasons for termination were pretextual. In this case, the decision makers were the Board and Fraser, independent of Faas. *There is no evidence raising a serious doubt that the Board [had] a "reasonable belief" as to the manifold reasons for discharging Plaintiff – i.e., . . . insubordination as to Fraser, refusal to obey the protocol, inappropriate conduct as to management assessment [the OCI evaluations], verbal abuse of colleagues, efforts to manipulate management assessments, disparaging*

---

[1]The district court should not have said that Scott "essentially" got new supervisors in April 2002; she *literally* and *entirely* got new supervisors. Scott has not disputed that from mid-April onward, she reported not to Faas but only to the Board and Fraser.

[2]The district court also stated that Scott "withheld from the corporation tapes evidencing corporate minutes." *United States v. Metro. Health Corp.*, 375 F. Supp. 2d 626, 646 (W.D. Mich. 2005). However, unlike the alteration of the minutes, Scott did *not* expressly admit withholding the tapes.

> *fellow officers [in front of her subordinates], and threatening to retaliate against
> staff to name a few reasons.* This is a mountain not a mole hill.

*United States v. Metro. Health Corp.*, 375 F. Supp. 2d 626, 646, 647 (W.D. Mich. 2005) (emphasis
added).

Metro points out that as soon as Scott made her compliance and employment complaints to
the Executive Committee (in meetings on April 19, 20, and 22, 2002), it rescinded Scott's planned
reassignment and hired law firms to investigate her allegations. Both firms reported to the Board
that Scott had interfered with their investigations by creating and submitting false evidence (the
doctored minutes), hiding evidence (the tapes), and attempting to influence or intimidate her staff
away from honestly cooperating with the investigation. In addition, the Board had numerous reports
of Scott's bizarre, disruptive, distracting, rude, threatening, and unprofessional conduct towards
superiors, fellow managers, and staff. Thus, Metro contends that there is no genuine issue that the
Board honestly believed that these reports were true and that they warranted Scott's termination.

On April 17, CPO Sefton told Scott that Metro was going to change her role so that she
would have no direct reports and would manage only the Borgess relationship. However, the
reassignment never took place. Scott immediately contacted her lawyer and Fraser, who scheduled
meetings for the 19th, 20th, and 22nd before the Executive Committee. That same day, as soon as
Fraser told Faas about Scott's presentation of compliance and employment law concerns to the
Executive Committee, Faas rescinded the planned reassignment.

It is undisputed that Metro never implemented the reassignment. Accordingly, Scott suffered
no tangible harm as a result of the immediately-rescinded reassignment announcement. The law in

our circuit is that actions that are not implemented are not adverse employment actions. *See Mitchell v. Vanderbilt Univ.*, 389 F.3d 177, 182 (6th Cir. 2004) ("Graham's proposals to reduce Mitchell's pay, alter his employment status, and reassign him . . . were never implemented and therefore not adverse employment actions.").

About two months after the aborted reassignment, Metro placed Scott on paid leave pending investigation. In our circuit, "'a suspension *with* pay and full benefits pending a timely investigation into suspected wrongdoing is not an adverse employment action.'" *Peltier v. United States*, 388 F.3d 984, 988 (6th Cir. 2004) (quoting *White v. Burlington No. & Santa Fe Ry. Co.*, 364 F.3d 789, 803 (6th Cir. 2004) (en banc), *aff'd o.g.*, – U.S. –, 126 S. Ct. 2405 (2006)).

Because the unimplemented April 2002 reassignment and the June 2002 paid leave were not materially adverse actions, they cannot serve as the basis for an FCA retaliation claim. That leaves only one materially adverse action: Scott's termination in January 2003.

Even assuming *arguendo* that Scott could make out a prima facie case of FCA retaliation with regard to her January 2003 termination, Metro was still entitled to summary judgment because Metro's stated reasons for the termination were not pretexts for FCA retaliation. Scott fails to show a reasonable dispute as to whether Metro made a "reasonably informed and considered decision" that demonstrates an "honest belief" in the proffered reasons.

On summary judgment, the question is not whether the complaints about Scott were "true" or made in good faith. Likewise, the question is not whether Scott's asserted reasons for altering the minutes are sincere, credible, or legitimate. The question is whether Scott has established a genuine issue as to whether Metro *honestly believed* that the complaints were true and warranted her

termination.  Scott has not done so.  *Cf. Balmer*, 423 F.3d at 615 (affirming summary judgment for employer on retaliation claim and stating, "Even if a genuine issue of material fact remains as to whether Plaintiff improperly used HCI's funds to pay for personal legal research, Plaintiff has put forth no evidence suggesting that [the person ] who ultimately made the decision to end Plaintiff's employment, did not 'honestly believe' that Plaintiff had misused HCI's funds.").

It cannot be said that Metro's decision to terminate Scott was not "reasonably informed and considered."  First, Metro did not reach that decision early on in Scott's employment, without giving her an opportunity to acclimate to the organization and develop a record and reputation.  For instance, if Scott had started working for Metro in 2000 or 2001 and started raising compliance concerns immediately or shortly thereafter, a reasonable jury might suspect that Metro took umbrage at her FCA protected activity and thus decided not to give her a chance.  Scott began working for Metro around January 1, 1998, and even her version of events alleges that Faas did not decide to terminate her until over four years later, shortly before the aborted April 2002 reassignment.  After the Executive Committee and Fraser replaced Faas as Scott's direct superior in April 2002, the committee did not decide to terminate Scott until sometime late in 2002.

Second, Metro's decision to terminate Scott was supported by widespread complaints about Scott's conduct.  If Metro had terminated Scott after receiving only one or two complaints, one might argue that the complaints stemmed merely from the kind of routine personality clashes and everyday disagreements that can develop in the workplace, even when the participants are not unstable, uncooperative, or belligerent – just a person or two whom Scott "rubbed the wrong way" and vice versa.  In that situation, a reasonable jury might believe that Metro was seizing upon the first

complaints to come along as convenient pretexts to get rid of her and stop her compliance complaints. But here, it is undisputed that Metro received complaints from a large and diverse group of people over a period of years. There is no basis for Scott's assertion that Metro had to dig through "five years of performance, thousands of e-mails, reports, interactions, etc. in order to extract *only a handful* of 'negative' interactions . . . ."

Third, Metro does not justify its decision to terminate Scott only by reference to complaints that came from other senior managers. If Metro had done so, a reasonable jury might conclude that the complaints were merely the result of the "turf wars" that can occur between officers who have substantial authority within a corporation and compete with each other for influence and a wide portfolio of job duties. Examples might be the allegations that Scott attempted to undermine CFO Smedes and prevent him from assuming powers that she believed should be her own; or that Scott infringed on the role of Christine Lawrence with respect to the sexual harassment matter at one of Metro's off-campus clinics. But, it is undisputed that Metro received complaints from people who were not fellow managers and therefore Scott's direct potential rivals.

Fourth, Metro does not justify its decision to terminate Scott based only on complaints from her subordinates, particularly subordinates who Scott could show had poor work records or were eventually fired or encouraged to leave Metro. If those were the only complaints Metro received, a reasonable jury might conclude that Metro did not honestly believe the problem was Scott rather than the underperforming employees. In other words, a jury might conclude that Metro knew the complainers simply resented Scott for requiring them to work hard, giving them negative

–10–

evaluations, or recommending action against them based on their performance or attitude. Rather, it is undisputed that Metro received complaints from people who were never Scott's subordinates.

Fifth, Metro had no reason to believe that any of the grounds for terminating her were improving. As to Scott's alleged conflicts with coworkers and mistreatment of subordinates, Scott presents no evidence that the complaints tapered off in number or severity. Nor does she allege that she tried to address the gravamen of the complaints and change how she came across to a wide range of colleagues and subordinates – rather than merely attacking the complainants.

With regard to Scott's admitted alteration of the minutes, there is no evidence that she ever apologized and began to behave ethically and cooperate with her superiors and with Metro's counsel. Instead, Metro had reason to believe that Scott continued to engage in unethical and untrustworthy conduct: in June and July 2002, she first claimed not to have any tapes of the Board meeting, then "found" one tape, then produced that tape with a portion apparently erased (the very portion that would have matched the original minutes and contradicted her alterations).

Metro also had reason to believe that Scott continued to be uncooperative and disobedient: after signing the April 29, 2002, agreement promising to keep the situation confidential, she told subordinates that she was no longer reporting to Faas. After attorneys Fraser and Valiant repeatedly instructed Scott not to gather documents that were not in her possession (and not to have her staff do so), Scott's subordinates reported that she continued to do so anyway.

In summary, Metro had good reason to believe that Scott showed no signs of ceasing her objectionable behavior.

–11–

Sixth, and significant for a retaliation case, Metro did not claim to have received complaints about Scott only *after* she went to the Executive Committee with her compliance complaints in April 2002. If Metro had done so, a reasonable jury might suspect that the complaints were not legitimate in the sense of being independently made by the complaining parties. In other words, a jury might conclude from the timing of the complaints that Metro had encouraged such complaints in order to build a case for firing Scott, when its real motive was to retaliate for her FCA activity. But it is undisputed that Metro received complaints about Scott long before she went to the committee in April 2002.

Seventh, and perhaps most significant, Metro did not merely accept complaints about Scott at face value without taking the time to let events unfold and give Scott a fair chance. By waiting as long as it did to terminate Scott, Metro took the time to see whether the complaints evinced a pattern of behavior by Scott that it could not tolerate. On this extreme and voluminous record, Metro can honestly say that it acted only after pressed to do so by the sheer number of complaints, the length of time and different contexts covered by the complaints, and the diversity of sources for the complaints. Moreover, Fraser interviewed Scott's subordinates in April-May 2002 – and Scott cannot deny that Fraser did so, nor complain that Metro deliberately chose interviewees whom it knew disliked Scott, because *Scott herself* urged Fraser to meet with her subordinates and even identified the people with whom she wanted him to speak. Thus, it is untenable for Scott to charge that Metro "merely rubber-stamped" the complaints with "no independent investigation" of its own.

So far we have focused on the complaints against Scott and her relationship with her superiors, peers, and subordinates. This is appropriate, because such evidence constitutes so much

of the enormous record in this case and Scott cannot convince a reasonable jury that Metro did not believe that the complaints were true and serious enough to warrant her termination. But there is another, independent reason to affirm summary judgment. Scott cannot convince a reasonable jury that Metro did not believe that she secretly altered the minutes of a Board meeting, withheld tapes of that meeting, and disobeyed repeated instruction to stop gathering documents not in her possession – and that such conduct warranted termination as well.

Finally, in an attempt to show that her termination was not a "reasonably informed and considered" decision (which Metro needs for its "honest belief" defense), Scott complains that the Board should have investigated her alteration of the minutes. This contention is untenable to the point of absurdity. Under the unusual circumstances of this case, further "investigation" into Scott's alteration of the minutes was unnecessary and pointless.

Scott expressly admitted that she secretly altered the corporate minutes. That alone was sufficient to warrant Scott's discharge. Scott did not contact her superiors or other participants in the meeting to express her view that Wiest's minutes needed to be corrected. If she had done so and the Board cited her proposal to revise the minutes as a reason for termination without investigating, Metro might not have an "honest belief" defense to pretext.

But Scott did not proceed in an honest, ethical fashion with regard to the minutes. Rather, she *unilaterally and by stealth* altered the minutes and got caught trying to pass off her version as the original by "returning" the altered version to her secretary, Wiest, and by presenting the altered version to Metro's outside counsel without acknowledging the unauthorized alterations. Even

–13–

assuming arguendo that Scott's alterations accurately reflected what happened at the meeting, that would not change the underhanded nature of what she did.

Scott's attempts to justify her secret alteration of the minutes is irrelevant because they do not negate the fact that Metro legitimately perceived her to be untrustworthy because of the alteration.

In short, Metro formed an honest belief in the complaints against Scott, which were sufficiently corroborated and investigated, and it did not need to investigate her admitted unauthorized alteration of the minutes. *See Smith v. Chrysler*, 155 F.3d 799, 807 (6th Cir. 1998). Therefore, there is no genuine issue that the committee's decision to terminate Scott was a reasonably informed and considered one, and Scott cannot prove pretext to a reasonable factfinder. This entitles Metro and Faas to summary judgment.

In view of our disposition, we need not address whether Scott made out a prima facie case of retaliation.

IV.

We turn now to Scott's recusal motion, which the district court denied in *United States v. Metro. Health Corp.*, No. 1:02-CV-485, 2006 WL 763180 (W.D. Mich. Feb. 23, 2006).

Preliminarily, we note that a judge is presumed to be impartial, and the party seeking disqualification "bears the substantial burden of proving otherwise." *United States v. Denton*, 434 F.3d 1104, 1111 (8th Cir. 2006). The burden is not on the judge to prove that he is impartial. *In re McCarthey*, 368 F.3d 1266, 1269 (10th Cir. 1004).

Title 28 U.S.C. § 144, entitled Bias or prejudice of judge, provides as follows:

–14–

> Whenever a party to any proceeding in a district court makes and files a timely and sufficient affidavit that the judge before whom the matter is pending has a personal bias or prejudice either against him or in favor of any adverse party, such judge shall proceed no further therein . . . .
>
> The affidavit shall state the facts and the reasons for the belief that bias or prejudice exists, and shall be filed not less than ten days before the beginning of the term at which the proceeding is to be heard, or good cause shall be shown for failure to file it within such time. A party may file only one such affidavit in any case. It shall be accompanied by a certificate of counsel of record stating that it is made in good faith.

Recusal is mandatory under § 144 once a party submits a timely, sufficient affidavit and her counsel certifies that the affidavit is made in good faith. *United States v. Sykes*, 7 F.3d 1331, 1339 (7th Cir. 1993).

A § 144 affidavit is timely if it is submitted "at the earliest moment after the movant acquires knowledge of the facts demonstrating the basis for such disqualification." *Id.* For purposes of § 144, a district court is required to accept as true the factual allegations of the movant's affidavit, but the court "may only credit facts that are sufficiently definite and particular to convince a reasonable person that bias exists; simple conclusions, opinions, or rumors are insufficient." *Hoffman v. Caterpillar, Inc.*, 368 F.3d 709, 718 (7th Cir. 2004). The § 144 affidavit must state factual averments with particularity as to time, person, place, and circumstances. *Tezak v. United States*, 256 F.3d 702, 717 (7th Cir. 2001). For purposes of § 144, a district court must treat properly presented factual allegations as true, even if it knows or believes them to be false, but it is not bound to accept the conclusions that the movant would draw from those facts. *Id.*

Here, we need not consider whether Scott's recusal affidavit was timely and sufficient for purposes of § 144 because Scott does not contest Metro's statement that she failed to file the

certificate of counsel required by that section. Accordingly, Scott never placed a § 144 recusal motion properly before the district court. The requirements of § 144 are strictly construed to prevent abuse because the statute is heavily weighted in favor of recusal. *Hoffman*, 368 F.3d at 718. *See, e.g., United States v. Occhipinti*, 851 F. Supp. 523 (S.D. N.Y. 1993), which reasoned correctly that

> a careful reading of § 144 clearly shows that a motion for recusal should be accompanied by both a factual affidavit and a separate certificate that the affidavit was made in good faith. Totally disregarding the statute, petitioner offers a single "Certification" which purports to satisfy the requirements of § 144. Moreover, while petitioner's counsel states that the allegations which he has raised are true and acknowledges that if they are "willfully false, [he] is subject to punishment," this blanket statement does not satisfy the statutory requirement that counsel certify that the motion is made in good faith.

*Id.* at 527 (record citation omitted).

Because Scott did not properly raise the § 144 recusal issue below, we decline to consider whether recusal might have been required on a proper motion under that section. *See Perez v. Oakland Cty.*, 466 F.3d 416, 430 (6th Cir. 2006) ("We do not consider an argument raised for the first time on appeal unless the party shows that refusal to consider the argument would result in a miscarriage of justice.").

Scott's recusal motion also invoked another statutory provision, however, which did not require her to file a certification of counsel. This latter provision addresses the perception of impartiality generally, and financial conflict of interest in particular, and provides as follows:

> (a)     *Any* justice, *judge*, or magistrate judge *of the United States shall disqualify himself in any proceeding in which his impartiality might reasonably be questioned.*
>
> (b)     *He shall also disqualify himself in the following circumstances:*
>
> (1)     *Where he has a personal bias or prejudice concerning a party . . . ;*

* * *

*(4)      He knows that* he, individually or as a fiduciary, or *his spouse . . . has a financial interest in the subject matter in controversy or in a party to the proceeding, or any other interest that could be substantially affected by the outcome of the proceeding;*

(5)      He or his spouse, or a person within the third degree of relationship to either of them, or the spouse of such a person:

(i)      Is a party to the proceeding, or an officer, director, or trustee of a party;

(ii)      Is acting as a lawyer in the proceeding;

(iii)      Is known by the judge to have an interest that could be substantially affected by the outcome of the proceeding;

(iv)      Is to the judge's knowledge likely to be a material witness in the proceeding.

28 U.S.C. §§ 455(a) & (b) (emphasis added).  The statute defines "financial interest" as "ownership of a legal or equitable interest, however small, or a relationship as a director, adviser, or other active participant in the affairs of a party," with exceptions not relevant here.  28 U.S.C. § 455(d)(4).

Because those safeguards (§ 144's affidavit and certification-of-counsel requirements) are lacking, § 455 does not require the judge to "accept as true the allegations made by the party seeking recusal." *In re Martinez-Catala*, 129 F.3d 213, 220 (1st Cir. 1997).  Rather, the district court may make the necessary factual findings and decide whether the facts warrant disqualification. *Id*.  When considering a § 455 recusal request, "the judge is free to make credibility determinations, assign to the evidence what he believes to be its proper weight, and to contradict the evidence with facts drawn from his personal knowledge." *United States v. Balistrieri*, 779 F.2d 1191, 1202 (7th Cir. 1985).

Section 455 is designed "'to promote confidence in the judiciary by avoiding even the appearance of impropriety whenever possible.'" *Union Planters Bank v. L&J Dev. Co., Inc.*, 115

–17–

F.3d 378, 383 (6th Cir. 1997) (quoting *Liljeberg v. Health Servs. Acquisition Corp.*, 486 U.S. 847, 865 (1988)). Under § 455, the ultimate question is whether "a reasonable, objective person, knowing all of the circumstances, would have questioned the judge's impartiality." *United States v. Hartsel*, 199 F.3d 812, 820 (6th Cir. 1999). Because the standard is objective, the judge need not recuse himself based on the subjective view of a party. *United States v. Sammons*, 918 F.2d 592, 599 (6th Cir. 1990).

When the objective appearance-of-partiality standard presents a close question, "'the judge must recuse himself.'" *Union Planters Bank*, 115 F.3d at 383 (quoting *United States v. Dandy*, 998 F.2d 1344, 1349 (6th Cir. 1993)). Nonetheless, as the late Chief Justice Rehnquist noted, "a federal judge has a duty to sit where not disqualified which is equally as strong as the duty to not sit where disqualified." *Laird v. Tatum*, 409 U.S. 824, 837 (1972) (emphasis omitted).

Scott's first ground for recusal is that the "Judge had, through his wife, an ongoing financial interest, within the meaning of 28 U.S.C. §§ 144, 455 and the case law thereunder, in this case resolving favorably to defendant . . . ." We consider Scott's first ground as a claim under § 455(b)(4), which requires a judge to recuse himself when "his spouse . . . has a financial interest in the subject matter in controversy or in a party to the proceeding, or any other interest that could be substantially affected by the outcome of the proceeding."

The judge's wife is employed by the law firm Miller Canfield. While the judge's wife was an attorney at Miller Canfield's Kalamazoo office, attorneys in that firm's Ann Arbor office represented UBS Financial Services, Inc. ("UBS") in connection with UBS's underwriting of $165 million in bonds issued by Metro to finance construction of a new hospital complex.

Scott alleged that her *qui tam* action, and the government's November 2003 intervention in a portion of the action, generated adverse publicity that delayed Metro's bond sale several months past its scheduled date in December 2003. While Metro denies that Scott's *qui tam* action was responsible for the delay, we assume arguendo that it was.

Scott emphasizes that Metro settled the *qui tam* claims in December 2003, just days before the bonds were to be sold. Metro settled the fraud claims by agreeing to pay the government about $6.25 million in FCA damages. Scott quotes a Metro spokesman's contemporaneous statement, "The bond marketplace likes certainty. If we had decided to litigate [the *qui tam* claims], we would have had a problem selling the bonds."

Scott charged that the judge's wife, and therefore the judge, stood to gain if Scott's *qui tam* action were resolved in favor of Metro:

> When the bond sale was halted in December 2003, the bond underwriter, UBS . . . had already invested significant resources into this plan. Thus, there was a huge financial incentive, not only for [Metro], but also for UBS, to make the bond sale a reality . . . . Importantly, Pamela Enslen had just recently rejoined Miller Canfield as Senior Counsel . . . (UBS's legal counsel on the bond sale) at that time. It is reasonable to conclude that failure of the bond sale would have constituted a big loss to UBS and Miller Canfield and that these entities clearly benefitted from making the Mary Scott [*qui tam*] case go away so as to get the bond sale back on track.

But Scott fails to tie the judge's alleged financial stake (through his wife's firm's stake in the success of its client UBS, which underwrote Metro's bond issue) with the judge's rulings in this action. As the district court observed, Metro's summary judgment motion could not affect Metro's bond sale one way or the other: the bonds were successfully issued and sold well *before* the district court ruled on the retaliatory-discharge claim. Whatever benefit Miller Canfield derived from the

success of the bond sale on which it advised UBS, it had already derived before the district court

ruled. Thus, whatever benefit the judge's wife allegedly derived indirectly from the success of the

bond sale on which her employer advised UBS, she derived it before the court ruled.

Scott tries to get around this inconvenient fact by implying that the judge made up his mind,

before the Metro bond sale, about how he would rule on summary judgment, and "telegraphed" his

prejudice to the underwriter (UBS) and other parties interested in the bond sale. Scott writes:

> Appellees attempt to make much of the fact that the bond sale was ultimately
> completed before [the judge] actually entered his order dismissing the Mary Scott
> litigation. So what? The fact that the sale went through several months before the
> decision actually was issued is not in and of itself dispositive of anything.
>
> * * *
>
> [T]he fact that the bond sale was completed in the Spring of 2005 and the final
> decision of [the judge] in this case was not issued until Summer of 2005 does not in
> and of itself mean that there was no connection between the two events. If the final
> decision of [the judge] was in fact made to benefit clients of his wife's law firm, then
> certainly it is not inconceivable that his wife (and thus her law firm's clients) might
> have known of the impending decision before it was issued.

Scott admits, as she must, that this serious charge is nothing more than speculation: "Again, Mary

Scott does not make such a statement in order to say that is in fact what happened. * * * [S]he

simply does not know, and has no way of knowing, if that is what happened." But it is not enough

for Scott to throw out charges and then maintain that they cast a pall over the proceedings because

they are "not inconceivable." The judge is presumed to be impartial, and Scott "bears the substantial

burden of proving otherwise." *Denton*, 434 F.3d at 1111. It is not the burden of the judge, or the

prevailing party, to *dis*prove or rule out any "conceivable" chain of events the movant can dream up.

Scott offers nothing that would lead a reasonable, objective observer to suspect that the judge told anyone in advance how the case would turn out.

In addition, Scott does not allege that the judge's wife was involved in Miller Canfield's representation of UBS on the Metro bond sale. Indeed, Scott does not allege that the judge's wife even represented Metro or UBS on matters other than the bond sale. *Contrast In re Aetna Cas. & Surety Co.*, 919 F.2d 1136 (6th Cir. 1990) (recusal was required because, *inter alia*, the judge's daughter had been employed by a firm that represented a party in that very case and she had participated in depositions therein, even though she had since resigned from the firm and her now-former firm was not involved in all the consolidated cases).

Going a step further back in the "chain," Scott failed to present any evidence that the failure or further delay of the bond sale would have affected Miller Canfield substantially in the first place. For example, Scott did not present evidence that Miller Canfield's fees from UBS were contingent upon the success of the bond sale. Nor did Scott present evidence that the damage to Miller Canfield's revenues from the failure of the bond sale would have represented a substantial portion of its revenues.

Moreover, given that the judge's wife is not a partner at Miller Canfield and has no equity, ownership, or profit-sharing interest in the firm, Scott failed to explain how she would reap any discernible financial benefit from the later grant of summary judgment to Metro. Scott presents no evidence that the judge's wife's compensation was formally or informally tied to the success of the firm's representation of UBS, the success of the UBS underwritten bond sale, or the firm's revenues or profits generally. *See United States v. McDonald*, Nos. 97-5187, 97-5196, 97-5338, 97-5339, &

–21–

97-5556, 173 F.3d 430, 1999 WL 149658, at *13 (6th Cir. Mar. 1, 1999) (judge not required to recuse herself due to husband's employment with law firm that had represented one of the defendants in an unrelated civil matter; "[t]he law firm was not involved in the present action, and there was no way that the judge could have financially benefitted from the law firm's representation of [the defendant], due to the law firm's fee structuring arrangement."). *Accord In re Kansas Pub. Employees Ret. Sys.*, 85 F.3d 1353, 1364 (8th Cir. 1996) (judge's daughter's acceptance of job with defense counsel did not require recusal; among other things, the daughter "was to be a salaried employee . . . , not a partner whose income is directly related to the profit margin of the firm and could be substantially affected by the outcome of this case").

One might assume that an attorney is better off if his firm's clients prosper, in the general sense that the firm needs clients in order to earn enough revenue to cover its expenses (including salaries and benefits) and avoid eventual pay cuts, layoffs, or dissolution. But any postulated long-term general financial "benefit" to the judge's wife from her employer's client's success is not verifiable, let alone quantifiable, so Mrs. Enslen's supposed stake in the success of UBS's Metro bond sale is far too attenuated and speculative as a matter of law. *See IQ Prods. Co. v. Pennzoil Prods. Co.*, 305 F.3d at 368, 378 (5th Cir. 2002) ("An associate's continued employment or the amount of his bonus may depend on the financial success of the firm. However, this is an insufficient interest to require disqualification . . . ."). Similarly, in *Sensley v. Albritton*, 385 F.3d 591 (5th Cir. 2004), the Fifth Circuit held that recusal was not required due to the judge's wife's employment with the same D.A.'s office that represented defendant in the case *sub judice*. The Fifth Circuit explained that the parties seeking recusal

> are only able to make this argument by layering several speculative premises on top of one another to reach a speculative conclusion: if District Attorney Levy loses this case, it *might* adversely affect his political popularity; and if it adversely affects his political popularity, he *might* lose his next election; and if he loses his next election, [the judge's wife] *might* lose her job if the new district attorney chose not to retain her. This edifice of conjecture will not support an objective conclusion that [the district judge] has a financial interest in the outcome of this case.

*Id.* at 600.

Next, Scott suggests that even if Miller Canfield would have suffered no substantial *financial* harm from the failure of the Metro bond sale, it would have suffered substantial *non-financial* harms. Scott reasons,

> [T]he financial position and outlook of the clients of the Miller Canfield law firm improved dramatically upon the dismissal of Mary Scott's claims . . . . [It] would not be illogical for a reasonable person to conclude that Miller Canfield would – and did – benefit from its clients' good fortune, if not in a pecuniary fashion, then at the very least in terms of the reputation and goodwill associated with the firm.

But even if we accept this argument, it is again impossible to do more than speculate that the judge's wife might someday reap a benefit as an indirect result of the success of one or more of her employer's clients on a particular transaction.

The Eighth Circuit rejected an argument similar to Scott's in *United States v. Tierney*, 947 F.2d 854 (8th Cir. 1991), a prosecution for tax offenses and fraud against the United States. The defendant moved to recuse the prosecutor under 18 U.S.C. § 208(a), which prohibits a federal employee from participating in a matter in which his spouse has a financial interest, and under a regulation that prohibited a Department of Justice employee from participating in a prosecution if he has a personal relationship with anyone who has a "specific and substantial interest that would be directly affected by the outcome of the investigation or prosecution." *Tierney*, 947 F.2d at 864.

The prosecutor's husband was a partner in a firm that represented an insurer that had sued for declaratory judgment rescinding the defendant's insurance policy. *Id.* at 864-65. The Eighth Circuit held that the prosecutor and her husband did not have an interest sufficient to require recusal:

> Although the prosecutor's husband did not participate in the case, defendant nevertheless reasons that because defendant's alleged dishonesty might bar recovery under the insurance policy, the insurer and its law firm would benefit from a guilty verdict. The district court agreed that the insurer would benefit, but found that because the husband's law firm was paid on an hourly basis, it would not benefit from a guilty verdict, and the husband's interest as a partner in the firm was therefore too "remote and speculative" to implicate either [18 U.S.C.] § 208 or Justice Department regulations. * * *
>
> [D]efendant argues that even partners in a firm which bills clients by the hour have an interest in winning a suit, because the firm's reputation (and thus each partner's income) benefits from victory. Although such partners may have an interest in prevailing, we believe that this interest is simply too insubstantial to require disqualification of a partner's spouse [even] in related litigation.

*Id.* at 865. Like the Eighth Circuit in *Tierney*, we hold that "disqualification is not required on the basis of [such] remote, contingent, indirect or speculative interests." *United States v. Bayless*, 201 F.3d 116, 127 (2d Cir. 2000).

Finally, Scott's reasoning tends to support the notion that the judge's wife had an interest in *the qui tam claims* being resolved in favor of Metro so that the Metro bond sale could go forward. Scott's argument does *not* show that the judge's wife had an interest in Scott's *discharge claim* being resolved in Metro's favor. As mentioned above, the bond sale took place after Metro settled the *qui tam* claims (March 2005 compared to December 2003), but *before* the district court ruled on the discharge claim (summer 2005). Thus, any adverse publicity or perceived financial uncertainty attributable to the pendency of the discharge claim did not, in fact, thwart the bond sale.

Conversely, once the Metro bonds issued, underwriter UBS could not have any interest in the discharge claim being removed as an obstacle to the sale. Therefore UBS's counsel (Miller Canfield) and its counsel's employees (the judge's wife) could not have any derivative or "down-the-line" interest in removing the discharge claim as a possible obstacle to the sale.

We conclude that the district court did not abuse its discretion in finding that a reasonable, objective person knowing all the circumstances would not question the judge's impartiality based on his wife's employment with Miller Canfield. *Cf. In re Drexel Burnham Lambert, Inc.*, 869 F.2d 116, 118 (2d Cir. 1989) (Miner, J., concurring in denial of reh'g en banc, joined by Meskill, Cardamone, and Pierce, JJ.) (recusal not warranted by judge's wife's sale of stock to a buyer whose purchase was financed by Drexel Burnham, which was a party to the action).

Scott's second ground for recusal is that the judge's wife serves on a Michigan Bar committee with then-District Judge McKeague, who had a law clerk whose uncle, Bruce Neckers, is lead counsel for Metro in this matter. This argument is difficult to comprehend. Defense counsel's nephew clerked for Judge *McKeague*, not the district judge presiding over the instant case, so the nephew could not work on the instant case.

Perhaps Scott is theorizing that the judge had an incentive to resolve her discharge claim favorably to Neckers' client, in order to benefit Neckers, in order to benefit (in an unspecified manner) Neckers' nephew, in order to please the nephew's former employer Judge McKeague, in order to ensure pleasant interaction between Judge McKeague and the judge's wife on the state bar committee. As a matter of law, such a connection is too attenuated to lead a reasonable, objective observer to question the judge's impartiality.

In any event, Scott herself "readily concedes that this type [of] relationship in and of itself would not be sufficient to warrant recusal of a federal judge" and that "if this were the only conflict . . . that she had discovered relative to the trial judge and this litigation, she would never have requested that the trial judge recuse himself . . . ." *See generally Comfort v. Lynn Sch. Comm.*, 418 F.3d 1, 26 (1st Cir.) ("Every judge comes to the bench with a lifetime of background experiences, a roster of associations, and a myriad of views. This past history, in and of itself, is seldom sufficient to require recusal."), *cert. denied*, – U.S. –, 126 S. Ct. 798 (2005).

Scott contends, however, that "when viewed in light of all of the other items . . . the relationship between attorney Bruce Neckers and the trial court does nothing to *reduce* the *appearance* of partiality." As discussed above, the "other item" – the judge's wife's employment with Miller Canfield – would not lead a reasonable objective observer to question the judge's partiality. Thus, there is nothing to view the McKeague clerk connection "in light of." It must stand on its own merits – and it does not.

Scott's third ground for recusal is that the judge's rulings granting summary judgment and imposing sanctions, and his opinions explaining the rulings, demonstrate palpable bias against Scott. To prevail on a recusal motion on this basis, Scott had to show either extrajudicial bias or a deep-seated unequivocal antagonism toward the petitioner. *Liteky v. United States*, 510 U.S. 540, 554-55 (1994) (Scalia, J.). The Supreme Court cautions that

> remarks during the course of a trial that are critical or disapproving of, or even hostile to, counsel, the parties, or their cases, ordinarily do not support a bias or partiality challenge . . . . *Not* establishing bias or partiality . . . are expressions of impatience, dissatisfaction, annoyance, and even anger that are within the bounds of what

imperfect men and women, even after having been confirmed as federal judges, sometimes display.

*Id.* at 555-56.

With regard to the judge's rulings against Scott, "[b]ias cannot be inferred from a mere pattern of rulings by a judicial officer, but requires evidence that the officer had it 'in' for the party for reasons unrelated to the officer's view of the law, erroneous as that view might be." *McLaughlin v. Union Oil Co. of Calif.*, 869 F.2d 1039, 1047 (7th Cir. 1989). This principle is well-established in our circuit. *See Woodruff v. Tomlin*, 593 F.2d 33, 44 (6th Cir. 1979) ("Such recusal [under 28 U.S.C. § 455(a)] cannot be based on decisions or rulings of a judge.") (citing *Oliver v. Mich. State Bd. of Educ.*, 508 F.2d 178 (6th Cir. 1974)), *on reh'g o.g.*, 616 F.2d 924 (6th Cir. 1980).

As evidence of the judge's bias, Scott complains that the judge ruled on significant motions without hearing oral argument, including Metro's motion for summary judgment on her discharge claim. Scott fails to acknowledge, however, that dispositive motions are routinely decided on papers filed by the parties, without oral arguments, just as this court often hears and determines appeals without oral argument. *Commodities Export Co. v. United States Customs Serv.*, 888 F.2d 431, 439 (6th Cir. 1989) (Nelson, J., concurring in part & dissenting in part o.g.). Indeed, the district's local rules provide, "In its discretion, the Court may schedule oral argument or may dispose of the motion without argument at the end of the briefing schedule." W.D. MICH. L.CIV.R. 7.2(d). Scott fails to mention that Metro also requested oral argument on its summary judgment motion, and the district court denied that request, too.

Scott's recusal motion also asserted that the district judge *sua sponte* raised and resolved unbriefed issues against her. However, Scott's recusal motion failed to give *any* example of an unbriefed issue raised on the judge's own initiative. Her appellate recusal brief likewise fails to specify the unbriefed issues allegedly raised *sua sponte* by the judge.

As further evidence of the judge's alleged bias against her, Scott points to "the granting of the extraordinarily high and unjustified sanctions against her . . . which, when examined through the lens of the undisclosed relationships recently discovered, clearly give the appearance that such relationships improperly affected the outcome of this case." As discussed above, however, neither the judge's wife's employment nor defense counsel's nephew's former clerkship comes close to constituting persuasive evidence of bias, conflict of interest, or even a realistic *appearance* of bias or conflict of interest. Thus, the sanctions awarded against Scott are not properly viewed "through the lens" of those relationships, but on their own merits. As discussed below, neither the imposition of sanctions, nor the determination of the amount of the sanctions, constituted an abuse of discretion. Therefore, the sanctions orders cannot support Scott's allegations of judicial bias.

Scott next contends that a reasonable person could infer bias from the fact that the judge issued opinions that "were harshly and critically written so as to vilify and castigate Mary Scott on a personal level." Scott points to three instances where the judge allegedly "interject[ed] his own personal predilections about her . . . ." First, in the opinion granting summary judgment to Metro, the judge's discussion of Scott's alleged protected activities began as follows: "Against this background, there is the portrait that Scott has painted of herself as the corporate/FCA avenger." Second, the next sentence of the opinion read, "To her credit, her personnel file *per se* was kept

–28–

squeaky clean and free from reprimands, discipline and the like." Third, the summary judgment

opinion's Background section states,

> In any event, the record is murky as to whether, when Scott was assigned the additional responsibility of managing Metropolitan's White and White [medical supply] subsidiary in January 2000, this was because of technical excellence (Plaintiff's view), because she was "kicked upstairs" to avoid an area of incompetence – i.e., interpersonal relations (Defendants' view), or for both reasons.

*United States v. Metro. Health Corp.*, 375 F. Supp. 2d 626, 630 (W.D. Mich. 2005) (footnote

omitted). As a result of the judge's characterizations of Scott, she claims the press began to portray

"the once lauded whistleblower . . . as a criminal and immoral wrongdoer, while Metropolitan's

image was sanitized."

As to the judge's tone and his comments about Scott's conduct and character, Scott contends

that the judge "engaged in excessively hostile and unjustified personal attacks against Mary Scott

(which have been amply evidenced by, among other things, the trial judge's excessive choice of

language, including mocking her as the 'FCA avenger'"). Scott's appellate briefs, however, do not

cite to the record for proof that the judge made this comment. If the judge made the comment at a

hearing, Scott could present either a transcript or recording of the hearing, or a statement that the

hearing was not transcribed or recorded; she has done neither, so we cannot simply accept her

assertion that the judge made the "avenger" comment.

First, there is no reason to believe that the judge's apparently negative opinion of Scott

stemmed from extrajudicial experiences or sources. A reasonable observer would conclude merely

that the judge formed a negative opinion of Scott from the voluminous evidence in the case, and

from the parties' conduct in the litigation. The evidence showed that Scott was terminated due to

misconduct (warranting summary judgment on her discharge claim) and altered and withheld evidence (warranting sanctions).

Our decisions formerly held that "[t]he judge's impressions o[r] perceptions based upon information gained during the trial cannot be the basis of an allegation of bias." *Liberis v. Craig*, No. 87-5321, 845 F.2d 326, 1988 WL 37450, at *4 (6th Cir. Apr. 25, 1988) (citations omitted). The rule now, however, is that "[o]pinions formed by the judge on the basis of facts introduced or events occurring in the course of the current proceedings, or of prior proceedings, do not constitute a basis for a bias or partiality motion *unless they display a deep-seated favoritism or antagonism that would make fair judgment impossible.*" *Alley v. Bell*, 307 F.3d 380, 388 (6th Cir. 2002) (emphasis added) (quoting *Liteky*, 510 U.S. at 555).

It is immaterial whether the judge's comments, such as the comment about the potentially criminal nature of Scott's spoliation, were legally "correct." What matters is that the comments stemmed from the judge's experience with the parties' conduct and his review of their evidence and arguments. Again, as the Supreme Court has explained,

> The judge who presides at a trial may, upon completion of the evidence, be exceedingly ill disposed towards [a party], who has been shown to be a thoroughly reprehensible person. But the judge is not thereby recusable for bias or prejudice, since his knowledge and the opinion it produced were properly and necessarily acquired in the course of the proceedings . . . .

*Liteky*, 510 U.S. at 550-51. Viewing the comments in this context, they do not betray a "deep-seated favoritism or antagonism that would make fair judgment impossible," *Alley*, 307 F.3d at 388.

Scott further charges:

> The trial judge consistently turned a blind eye to the fraudulent and underhanded actions of Appellees in all areas, from securing the certificate of need [for a new hospital] by "rigging the numbers," to sabotaging Mary Scott in her relationship with her peers and subordinates.

This argument misses the mark as well. First, whether Metro submitted false information to the State to secure the certificate required for its new facility has no bearing on whether Scott's discharge claim should survive summary judgment, or on whether Scott should pay sanctions for her misconduct. Therefore, it would have been unnecessary and inappropriate for the district judge to address the certificate-of-need allegation. Second, Scott fails to explain how Metro sabotaged her relationship with peers and subordinates, and she does not explain why the district judge should have considered that alleged sabotage.

Scott further charges, "The trial judge unjustifiably castigated Mary Scott for legally taping conversations to which she was a party . . . ." (Emphasis omitted.) Specifically, the court wrote,

> Plaintiff . . . dispute[s] Faas' rationale for withholding the bonus [in 2001] – arguing that it was explained to her in a meeting with Faas that the "in fighting" issue was not confined to her and [Metro's Chief Operations Officer Tim] Crowley, but was an issue for all Board members. Plaintiff also made a secret recording of portions of her meeting with Faas, . . . portions [of which] purport to support the above claim. At that time, and beforehand, Plaintiff was in the habit of making secret tape recordings of conversations she had with management and Metropolitan's legal counsel, Jeff Fraser, according to her former assistant . . . . The circumstances of the recording of these tapes by Plaintiff – including that the recordings are selective and possibly incomplete, and that portions of the tapes are inaudible – when combined with the furtive and suspicious nature of the taping, and the "accidental" loss of some documented tape recordings, makes those recordings suspect evidence indeed. Nevertheless, the Court will consider such evidence in the context of the present summary judgment motion.
>
> What is clear from Plaintiff's admissions[,] though, as well as the fact that she felt a need to make secret and selective tape recordings of others, is that she was unhappy with her employment situation with Metropolitan in the fall of 2001.

*United States v. Metro. Health Corp.*, 375 F. Supp. 2d 626, 630-31 (W.D. Mich. 2005). We find

nothing suggestive of personal bias in the judge's comments about Scott's tapes. The

characterization of Scott's recordings as "secret" and "furtive" are indisputably accurate; Scott does

not claim she made the recordings with the knowledge of those recorded. Likewise, Scott does not

deny that portions of the tapes are inaudible, that some of her tapes omit portions of the

conversations in question, and that she failed to produce some tapes that she claimed she made.

Thus, there is nothing inaccurate, let alone biased, about the judge calling the tapes "selective" and

"possibly incomplete" and concluding that these concerns undermined the trustworthiness and

probative value of the excerpts Scott chose to introduce.

Scott also sees bias in the judge's statement that it would have been inclined to grant Metro's

motion to exclude the tapes at trial. Specifically, the district court stated,

> Though the Court has elected to review such evidence, the parties should be advised
> that the Court is of the view that Defendants' Motion *in Limine* Regarding Tape
> Recordings and Transcripts is well received and would justify the preclusion of the
> tapes and transcripts were this matter tried[,] given the provisions of Federal Rules
> of Evidence 403, 1002, 1003, and 1004 and case law pertaining to the common law
> doctrine of spoliation . . . .

*United States v. Metro. Health Corp.*, 375 F. Supp. 2d 626, 631 n.5 (W.D. Mich. 2005). While it

was unnecessary for the court to telegraph how it would have ruled on the motion *in limine*, there

was nothing suggestive of personal bias about doing so. Moreover, because the court granted

summary judgment to Metro, Metro's motion *in limine* became moot.

Scott complains that the judge "labeled [her] a criminal for making corrections to draft

minutes without taking any evidence on the substantive accuracy of the corrections of Appellee

–32–

Faas's statements on the physician compensation model (which, despite what was allegedly said at

the meeting, were not historically accurate)." (Emphasis omitted.) Specifically, the judge wrote,

> In this case, Plaintiff has admitted facts which establish beyond any genuine issue of material fact that she wrongly altered corporate records and that she withheld from the corporation tapes evidencing corporate minutes. The withholding of the tapes was not "protected conduct" as argued by her counsel since she and her counsel were free to make arrangements with independent counsel for the safeguarding and/or copying of the tapes so as to protect her legitimate interests in the evidence. Moreover, the alteration of the corporate minutes was not only bad conduct, it was a crime under Michigan and common law.
>
> Michigan law provides:
>
> > An officer or agent of a corporation who knowingly falsifies or wrongfully alters the books, records, or accounts of a corporation is guilty of a misdemeanor and is subject to a fine of [sic] not to exceed $1,000.00 for each such offense.
>
> MICH. COMP. LAWS § 450.1932(2).
>
> * * *
>
> Plaintiff's own admissions – that she altered the minutes to make them true in some sense to a prior meeting – does not establish even a legal defense to a criminal charge. Under Michigan law, proof that a criminal defendant acted knowingly is sufficient evidence to convict of a criminal offense requiring a *scienter* element of "knowing" conduct; the fact that a defendant may have been motivated by an altruistic or pure motive is irrelevant. *See People v. Medlyn*, 544 N.W.2d 759, 761 (Mich. Ct. App. 1996); *People v. Harrell*, 221 N.W.2d 411, 416 (Mich. Ct. App. 1974).

*United States v. Metro. Health Corp.*, 375 F. Supp. 2d 626, 646-47 (W.D. Mich. 2005). Scott

implies misleadingly that the district judge merely tossed the epithet "criminal" at her due to his

personal animosity against her. Rather, as the quoted portion of the opinion shows, the judge quoted

a Michigan criminal statute that covers conduct such as that *admitted* by Scott, and explained why

her asserted good motive in secretly altering corporate minutes would not be a defense, on the authority of published decisions of the Michigan appellate courts. Scott continues to maintain that the original draft minutes "were not historically accurate," but she does not deny that she (1) furtively tried to locate the minutes from her assistant's desk, (2) altered the minutes, (3) failed to tell her employer that she altered the minutes, and (4) introduced the altered minutes without providing the original version or honestly notifying anyone that she had altered the minutes.

It is also noteworthy that Scott does not try to identify any shortcoming in the judge's analysis of Michigan law. The evidence that was available to the judge tends to support the conclusion that Scott could be held criminally liable in Michigan for her admitted alteration of corporate minutes, and she offers nothing to undermine that conclusion. There is no reason to believe that the judge's discussion of Michigan criminal law as applied to Scott was inaccurate, let alone motivated by bias.

Scott sees bias in the judge's "[m]aking findings of fact based on his total acceptance of affidavits from Appellees and rejection of affidavits of Mary Scott as not credible." In a variety of contexts, assessments of credibility (or determinations that rest in part on such assessments) are committed to the sound discretion of the lower tribunal; we do not disturb those assessments unless the aggrieved party demonstrates an abuse of discretion. *See United States v. Crumb*, 187 F. App'x 532, 536 (6th Cir. 2006) (when a defendant makes a FED. R. CRIM. P. 33 motion to set aside a verdict as against the manifest weight of the evidence and set a new trial, "the district court may assess witness credibility and we review for abuse of discretion . . . ."); *Huff v. Metro. Life Ins. Co.*, 675 F.2d 119, 123 (6th Cir. 1982) (affirming denial of motion for reconsideration of summary judgment because "we find no abuse of discretion in the district court's determination that the evidence would

not be considered because it was not newly discovered and its credibility was doubtful"). Scott makes no attempt to show that the district court abused its discretion by finding Metro's affidavits to be more credible than hers.

The judge's credibility assessment is most simply and logically explained by the evidence in the record, not by speculation about otherwise unproven bias. Most significant, Scott proved herself to be untrustworthy and untruthful when she (1) surreptitiously altered minutes of the February 7, 2002, board meeting; (2) took tapes of that meeting from her assistant in April 2002 and refused requests to return them, removing the most direct, objective means of verifying what was said at the meeting; (3) said she intended to review the tapes to make sure her unauthorized alteration ("correction") of the draft minutes was accurate, but somehow never found the tapes in order to perform that check; (4) admittedly found one of the tapes, which contained part of the meeting, in June 2002, but withheld it; and (5) later in this litigation, by "sheer luck," found all three tapes of the meeting. On this record, the judge did not need personal bias to conclude that Scott was less credible than Metro as to her conduct and the cause of her discharge.

Scott complains that the district court accused her of "actively [seeking] legal counsel to find a way to sue" Metro. However, in the passage of the summary judgment opinion cited by Scott, the district court accurately recounts communication between Scott and her attorney showing that by February 25, 2002– nearly two months before Scott's April 17, 2002, reassignment – Scott and her attorney had discussed possibly filing a claim for sex discrimination, apparently before even discussing a whistleblower retaliation claim. In addition, Scott's own writings show that she first contacted the same attorney in May 1999, nearly three years before her reassignment, regarding her

perception that Metro was discriminating against her, apparently on the basis of sex and age. The record supports a characterization of Scott as looking "early and often" (our words, not the district judge's) for grounds on which to sue Metro, even before her reassignment. The judge did not imply, let alone state, that there was anything illegal or unethical about Scott contacting an attorney repeatedly over the course of the years and harboring many grievances against Metro. A reasonable, objective observer would not question the judge's impartiality based on these limited, accurate comments.

> Scott also charges that the district court displayed bias by
>
> [m]aking a myriad of factual findings that totally lack objectivity and ignore what is in the record as fact, i.e. [sic, she means e.g.], finding that reports to Appellee Faas lacked specificity and did not rise to [the level of] allegations of fraud or fault, ignoring that the United States government ultimately pursued said fraud in the amount of $40,000,000.

(Record citations omitted.) Scott does not identify any other of these "myriad" of factual findings. Most of the portion of the summary judgment opinion cited by Scott has nothing to do with the specificity of reports to defendant Faas. As to the portion of the opinion that may be relevant to Scott's charge, she fails to explain which of the statements display a bias and how, so she has abandoned the argument.

Scott's penultimate complaint about personal bias concerns the judge's remark that because Scott's affidavit made an allegation that she had never made before, "caution must be had." The portion of the opinion cited by Scott does not contain the "caution must be had" language, but she is presumably referring to this statement earlier in the opinion:

> Plaintiff's testimony about her top secret, undocumented meetings with Faas relating to her unfinished memos is interesting for reasons other than its sheer unlikeliness . . . . Because the testimony presents for the first time specific testimony about prior meetings in a case in which neither discovery, deposition testimony [n]or extensive prior court filings have previously disclosed these matters, caution must be had. Plaintiff stated in a document filed on May 13, 2005 that Plaintiff's protected activity consisted of memorandums to Faas relating to Revenue Cycle. Indeed, Defendants took Plaintiff's deposition and specifically asked whether she had any meetings with Faas about vascular studies. She said "she did not . . ." (Scott Dep. at 523, Reply Mem., Ex. B) * * *

*United States v. Metro. Health Corp.*, 375 F. Supp. 2d 626, 641-42 (W.D. Mich. 2005). Scott conveniently omits the discussion preceding and following the judge's "caution must be had" statement. It was eminently reasonable for the judge to look skeptically at Scott's claim that she met with Faas about vascular study payments and lack of written orders, given that the claim contradicted her deposition testimony. The "caution must be had" comment does not evince personal bias.

Finally, Scott alleges bias in the judge's statement that she had "a history of litigation shenanigans, including repeatedly hiding discoverable evidence. As such, the newly-minted evidence [Scott's affidavit claiming, contrary to her deposition, that she had secret meetings with Faas about vascular study overcompensation and lack of written orders] will be excluded from consideration." *United States v. Metro. Health Corp.*, 375 F. Supp. 2d 626, 643 (W.D. Mich. 2005) (footnotes omitted). As discussed above, Scott's affidavit claim about secret meetings with Faas *did* contradict her deposition testimony.[3] Moreover, she *did* hide discoverable information; she admitted

---

[3]As the district court noted, a party cannot create a genuine issue of material fact by submitting an affidavit that contradicts her earlier deposition testimony. In addition to the decisions cited by the district court, *see Moore v. Lafayette Life Ins. Co.*, 458 F.3d 416, 433 (6th Cir. 2006); *Lanier v. Bryant*, 332 F.3d 999, 1004 (6th Cir. 2003). Scott's affidavit did not merely "clarify" and "elaborate on" her deposition testimony, as she asserts.

that she found one of the tapes of the meeting whose minutes she altered and that she nonetheless did not turn that tape over to Metro. The judge's choice of the word "shenanigans" was, if anything, charitable, and no reasonable, objective observer would suspect that it stemmed from personal bias.

We conclude that "a reasonable, objective person, knowing all of the circumstances," would *not* have questioned the judge's impartiality based on the substance or tone of his opinions or in-court statements. *See Hartsel*, 199 F.3d at 820; *cf. Blanche Road Corp. v. Bensalem Twp.*, 57 F.3d 253, 266 (3d Cir. 1995) ("Although it is true that at times the judge criticized plaintiffs for attempting to mislead the jury and became short-tempered with plaintiffs' counsel, these comments appear to arise from the judge's impatience and frustration with the manner in which plaintiffs were trying their case, rather than any partiality for defendants.").

In short, none of Scott's grounds for recusal present a close question. Requiring this district judge to recuse himself would encourage litigants to present "speculative and ethereal arguments for recusal and thus arrogat[e] to themselves a veto power over the assignment of judges." *Draper v. Reynolds*, 369 F.3d 1270, 1280 (11th Cir. 2004). The district judge did not abuse his discretion in denying the recusal motion, so we affirm the February 23, 2006, order appealed in No. 06-1562.

Because it was not an abuse of discretion to reject Scott's recusal motion on the merits, we can assume arguendo that Scott's recusal motion was timely.

V.

Scott filed a motion to reconsider the order denying recusal, which the district court denied in *United States v. Metro. Health Corp.*, No. 1:02-CV-485, 2006 WL 763181 (W.D. Mich. Mar. 24, 2006).

A district court may grant a motion for reconsideration – a motion to alter or amend judgment under FED. R. CIV. P. 59(e) – only if the movant shows (1) a clear error of law, (2) newly discovered evidence, (3) an intervening change in controlling law, or (4) a need to prevent manifest injustice. *Henderson v. Walled Lake Consol. Schs.*, 469 F.3d 479, 496 (6th Cir. 2006). Scott does not claim there was a change in the controlling law after she filed her recusal motion, but she essentially invoked the other three grounds for reconsideration: clear error of law, new evidence, and a need to prevent manifest injustice.

As to newly discovered evidence, Scott argued as follows:

> [N]ew evidence has come to light which the Court should consider in re-evaluating its decision regarding an appearance of impropriety in this matter. Miller Canfield (where [the judge's wife] is employed) was counsel for <u>not just one, but two, and possibly even three entities</u> that have a direct financial interest in the outcome of Plaintiff's case. Specifically, in addition to Miller Canfield representing UBS, the underwriter for Metropolitan's bond issue, Miller Canfield also represents Standard Federal Bank . . . as the issuer of a direct pay irrevocable line of credit for the $30,000,000 Series B portion of Metropolitan's bond issue. Additionally, Standard Federal Corporate and Institutional Trust . . . serves as the Bond Trustee for the entire $165,000,000 Metropolitan bond issue.
>
> * * * It is objectively reasonable to infer that, in the discharge of its duties as counsel for both [UBS and Standard Federal], Miller Canfield . . . not only assessed the validity, risk and potential outcome of the Mary Scott retaliation case . . . , but had an interest in the outcome of said case given its fiduciary role with UBS and Standard Federal.

For two reasons, this argument is of no avail to Scott. First, Scott does not explain why she did not learn of Miller Canfield's representation of these other entities, whether through discovery or otherwise, before filing her recusal motion, and included it in that motion. As with other rules of civil and criminal procedure, Rule 59(e)'s new-evidence prong required Scott to show that due

diligence would not have uncovered this evidence before the court ruled on her recusal motion; Scott makes no attempt at such a showing.

Even if we treated Miller Canfield's representation of bond issuer Standard Federal and bond trustee Standard Federal Corporate and Institutional Trust as newly discovered evidence, it does not support Scott's recusal argument. Whatever stake Miller Canfield had in the success of the bond sale was vindicated when the bonds were sold – which took place before the court ruled on summary judgment.

Scott's reconsideration motion seemed to further theorize that if her discharge claim were resolved against Metro, the following sequence of events could occur: (1) the bondholders would demand payment on the bonds, (2) Standard Federal (which was represented by the judge's wife's employer) would have to pay the bondholders, (3) Standard Federal would seek reimbursement from Metro, and (4) Metro's payment of damages on Scott's retaliatory-discharge claim would not leave sufficient resources to reimburse Standard Federal.

Even parsing this convoluted and implausible scenario from Scott's confusing reconsideration motion, it is still not clear how that sequence of events is supposed to tangibly harm Miller Canfield, let alone the judge's wife (who, again, did not own an interest in the law firm) and thus the judge. Scott alludes, without explanation, to Miller Canfield's "fiduciary role" with UBS and Standard, but does not elaborate. Finally, Scott speculates that this sequence of events would seriously impact these three clients of Miller Canfield, but she does not say what significance we should attach to that possibility. Apparently Scott is implying that Metro, UBS, and Standard Federal would suffer such losses as to be unable to pay Miller Canfield as much for future

representation. Even then, the connection to the judge's wife is at best extremely attenuated, as she does not have an ownership interest in Miller Canfield. In summary, such far-reaching speculation about unpredictable events affecting parties several times removed from the judge's wife's employer could not lead a reasonable person to perceive any impropriety on the part of the judge.

Having concluded that Scott was not entitled to reconsideration of recusal due to newly discovered evidence, we consider whether the order denying recusal contained a clear error of law or worked a manifest injustice. We conclude that Scott was not entitled to reconsideration on these grounds either. Other than the reconsideration arguments addressed above, Scott complains only that the judge's orders and opinions "have been peppered with unnecessary personal statements about the plaintiff and [the] case (such as, "May God forgive us all that we have spent valuable moments of our lives with such piddling disagreements" or "This is the fag end of a long and bitter suit. What is left is to exact a measure of justice according to what has come before"). This argument does not merit reconsideration, either.

First, Scott could and should have cited these two comments in her recusal motion. A Rule 59(e) motion is not the proper vehicle to raise arguments that should have been made before judgment. *GenCorp, Inc. v. Am. Int'l Underwriters*, 178 F.3d 804, 834 (6th Cir. 1999).

Second, Scott conveniently omits the language that accompanied the "God forgive us" statement. The district court was not calling the retaliatory discharge claim a "piddling disagreement." Here is the entirety of the footnote in which that statement appeared:

> Plaintiff has disagreed with [Metro counsel] Fraser's characterization that the Monday meeting was the "first" meeting between Plaintiff, Varnum attorneys and the Executive Committee. This disagreement, like much of this record, is insignificant.

> What Mary Scott is referring to is that one Varnum attorney, Jackie Scott, was with Fraser at the April 19-20, 2002 meetings and identified herself then as a Board Member (which she was); the parties do not disagree apparently that other members of the Executive Committee besides Jackie Scott attended the first such meeting on April 22, 2002. May God forgive us all that we have spent valuable moments of our lives with such piddling disagreements.

*US ex rel. Scott v. Metro. Health Corp.*, 375 F. Supp. 2d 626, 635 n.12 (W.D. Mich. 2005). This comment would not cause a reasonable, objective observer to suspect that the judge harbored personal bias against Scott that prevented fair judgment.

The March 24, 2006, order appealed in No. 06-1562 is also affirmed.

VI.

The district court's explanation of its sanctions decision adequately justifies its decision to find Scott liable for sanctions. The sanction amounts requested by defendants and awarded by the district court were well documented and close to the sum plaintiff admits incurring in this litigation. In this regard, we find no abuse of discretion and affirm for the reasons stated by the district court.

Based on Scott's conduct as described herein, and by the opinion below, the district court properly invoked Federal Rule of Civil Procedure 26 as authority for imposing sanctions on Scott.

In addition, Scott's conduct as described herein, and by the opinion below, justified the district court's decision to invoke Federal Rule of Civil Procedure 56(g) as authority for imposing sanctions on Scott.

The district court did not clearly err in finding that Scott submitted discovery filings that falsely certified that they were believed to be complete and accurate, in violation of Rule 26(g)(1) and (2). Nobody could know better than Scott whether she had all three tapes of the meeting. That

was flatly within her knowledge, and it was not clear error to find that Scott knew she was lying when her initial disclosures and later responses certified that she had not "found" all of them.

Once the court found that Scott violated Rule 26, it was *obligated* to impose sanctions under Rule 26(g)(3). *Malautea v. Suzuki Motor Co.*, 987 F.2d 1536, 1545 (11th Cir. 1993).

Nor did the district court clearly err in finding that Scott submitted affidavits that she knew were not truthful, and that therefore she presented the affidavits in bad faith, in violation of Rule 56. Scott obviously knew whether, as alleged in her affidavit, she developed her version of the minutes based on her honest recollection of what happened, rather than fabricating a version of events that she knew never occurred or inserting material to reflect what allegedly was said at a *prior* meeting.

Once the court found that Scott submitted an affidavit in bad faith, it was *obligated* to impose sanctions under Rule 56(g).

Finally, we hold that the district court did not abuse its discretion by invoking its inherent authority as an additional source of authority for the sanctions against Scott. In its opinion determining the amount of sanctions, the district court wrote persuasively,

> As noted in the Court's Opinion and Order of September 29, 2005, there are three bases for assessing liability against Plaintiff Mary Scott: inherent authority, Federal Rule of Civil Procedure 26(g) and Rule 56(g). Of these, inherent authority is obviously the most important because it touches all of Plaintiff's bad faith conduct during the litigation. A limited award under Rules 26 and 56 would not do justice to the magnitude of the offense.

* * *

> As indicated above, this Court has previously found Plaintiff's litigation conduct in this suit to have been in "bad faith" due to her pursuit of the factually baseless retaliation claim as part of a multi-million dollar lawsuit, the intentional concealment of multiple tape recordings, including the crucial minutes tapes, and the filing of

intentionally false affidavits on the minutes issue. The filing and litigation of the retaliation claim was, in light of this record, motivated by an "improper purpose" to harass and extort Plaintiff's former employer. *See First Bank of Marietta*, 307 F.3d at 524 (citing *Big Yank Corp. v. Liberty Mut. Fire Ins. Co.*, 125 F.3d 308, 314 (6th Cir. 1997)). In short, this was a case, like *Chambers* and *First Bank of Marietta*, that was long brewed and fermented in the liquor of "bad faith."

*Scott v. Metro. Health Corp.*, No. 1:02-CV-485, 2005 WL 3434830, at *3 and *6 (W.D. Mich. Dec. 13, 2005). We agree with the district court's reasoning.

VII.

For the foregoing reasons, we affirm the orders of the district court.